# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 5, 2009            Decided December 11, 2009

No. 08-1284

RURAL CELLULAR ASSOCIATION, ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

AT&T INC. AND VERIZON,
INTERVENORS

———

Consolidated with 08-1285

———

On Petitions for Review of an Order
of the Federal Communications Commission

———

*David A. LaFuria* argued the cause for petitioners. With
him on the briefs were *Russell D. Lukas* and *David L. Nace*.

*Donald J. Evans* was on the brief for *amicus curiae* Corr
Wireless Communications, LLC in support of petitioners.

*Maureen K. Flood*, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were *Robert B. Nicholson* and *Kristen C. Limarzi*, Attorneys, U.S. Department of Justice, *Matthew B. Berry*, General Counsel, Federal Communications Commission, *Joseph R. Palmore*, Deputy General Counsel, *Richard K. Welch*, Deputy Associate General Counsel, and *Laurence N. Bourne*, Counsel.

*Helgi C. Walker* argued the cause for intervenors AT&T Inc. and Verizon. With her on the brief were *Michael E. Glover*, *Edward Shakin*, *Christopher M. Miller*, *John T. Scott III*, and *Gary L. Phillips*.

Before: TATEL and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Petitioners—wireless telephone service providers serving primarily small and rural markets—challenge the Federal Communications Commission's (FCC or the Commission) decision to impose an interim cap on rapidly escalating subsidy payments. The universal support subsidy, intended to ensure adequate, reasonably priced service for residents of rural, sparsely populated, or hard-to-reach areas, increased by more than a billion dollars between 2001 and 2007. *See* FED.-STATE JOINT BD. ON UNIVERSAL SERV., CC Docket No. 98-202, UNIVERSAL SERVICE MONITORING REPORT tbl.3.2 (2008) ("UNIVERSAL SERVICE MONITORING REPORT"). Petitioners accuse the FCC of fumbling the procedural requirements of the Administrative Procedure Act (APA) in promulgating the interim order; violating the Federal Communications Act; and acting arbitrarily and capriciously.

3

I

A. *Telecommunications Act of 1996*

Since the passage of the Communications Act of 1934 (the Act), Congress has made universal service a fundamental goal of federal telecommunications regulation. Indeed, § 1 of the Act states the very purpose of the FCC is "to make available, so far as possible, to all the people of the United States . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151 (as amended).

In 1996, Congress amended the Act to introduce competition into local telephone service, Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, which had traditionally been provided through regulated monopolies, *see* 47 U.S.C. §§ 251, 252. At the same time, Congress also added a new universal service provision, § 254, to the Act. *See id.* § 254. The Telecommunications Act of 1996 established a Federal-State Joint Board on Universal Service (the Joint Board or Board) to recommend changes to the FCC's federal universal service regulations. Section 254(b) directs the Joint Board and the Commission to base policies for the preservation and advancement of universal service on six enumerated principles, plus such "other" principles as the Joint Board and the Commission may establish. *Id.* § 254(b)(1)–(7). Among these principles are "access . . . provided in all regions of the Nation . . . including low-income consumers and those in rural, insular, and high cost areas," "reasonably comparable" services and rates to those offered "in urban areas," "an equitable and nondiscriminatory contribution to the preservation and advancement of universal service," by "[a]ll providers of telecommunications services,"

and "specific, predictable, and sufficient Federal and State mechanisms to preserve and advance universal service." *Id.* § 254(b)(2)–(5). In addition, pursuant to its authority under § 254(b)(7) to adopt "other" universal service principles in the public interest, the Commission adopted a seventh "competitive neutrality" principle, which requires that "universal service support mechanisms and rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another." *In the Matter of Fed.-State Joint Bd. on Universal Serv.*, 12 F.C.C.R. 8776 ¶¶ 46–47 (1997). Another universal service provision, § 254(e), requires that federal universal service support be "explicit and sufficient to achieve" statutory purposes and restricts high-cost universal support to designated "eligible telecommunications carrier[s]" (ETCs). 47 U.S.C. § 254(e).

The Commission fulfills its mandate to provide universal service through the universal service fund (the USF). In addition to the high-cost support program, which is designed to support rural providers serving high-cost areas, the USF also supports programs for low-income customers, schools and libraries, and health care providers. *See* 47 C.F.R. §§ 54.415–54.605. High-cost support disbursements, however, overwhelmingly represent the largest category of USF expenditures, accounting for 61.6 percent of USF disbursements in 2007. *See* UNIVERSAL SERVICE MONITORING REPORT tbl.1.11. Prior to the FCC order challenged in this case, the high-cost program and the low-income program were the only two components of the USF not subject to a cap on total support.

Support for the fund comes from assessments paid by interstate telecommunications service providers. The assessments are calculated by applying a quarterly

"contribution factor" to the contributors' interstate revenues, and contributors almost always pass their contribution assessments through to their customers. *See Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 620 (5th Cir. 2000). Although incumbent local exchange carriers (ILECs) receive high-cost support based on their actual costs of providing service, under the Commission's "identical support rule," competitive ETCs (CETCs), mainly wireless providers, receive support for each line based not on their own costs, but rather on the same per-line support ILECs in the relevant service area receive. 47 C.F.R. § 54.307(a)(1).

B. *The Order*

In 2002, growth in the amount of USF support distributed under the high-cost program, particularly to CETCs, prompted the Commission to ask the Joint Board to review the Commission's high-cost support rules, specifically with respect to CETC service areas. The Board responded with several recommendations, including a recommendation to consider revisiting the identical support rule as a means for calculating support for CETCs. *See In the Matter of Fed.-State Joint Bd. on Universal Serv.*, 19 F.C.C.R. 4257 ¶ 96 (2004) (recommended decision). The Board also recommended high-cost support be limited to "a single connection that provides access to the public telephone network," rather than subsidizing multiple connections for the same household or business. *Id.* ¶ 56. The Board concluded "supporting a single connection is more consistent with the goals of section 254 of the Act than the present system, and is necessary to preserve the sustainability of the universal service fund . . . and would be competitively neutral." *Id.* The Board recognized, however, that restricting support to a single connection "may present significant administrative challenges." *Id.* ¶ 57. Thus, rather than suggesting the

Commission modify its methodology for calculating high-cost support at that time, the Board recommended the Commission consider support modifications for CETCs as part of a comprehensive review of high-cost support mechanisms. *See id.* ¶¶ 4, 88. In any event, before the Commission could act on the Board's recommendations, Congress enacted legislation specifically prohibiting the Commission from implementing the single connection rule. Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, § 634, 118 Stat. 2809 (2004).

After investigating and seeking comment on several high-cost support reform proposals, the Joint Board took action in May 2007 by recommending the Commission adopt an "interim, emergency cap" on high-cost support to CETCs. *In the Matter of High-Cost Universal Serv. Support*, 22 F.C.C.R. 8998 (2007) (recommended decision). Noting CETC high-cost support had skyrocketed from $15 million in 2001 (the correct figure appears to be $16.9 million) to almost $1 billion in 2006—an annual growth rate of over 100 percent—the Board concluded that "without immediate action to restrain growth in competitive ETC funding, the federal universal service fund is in dire jeopardy of becoming unsustainable." *Id.* ¶ 4. The Board acknowledged the interim cap would not be a permanent solution to problems with the high-cost support distribution mechanisms, *id.* ¶ 8, committed to making recommendations on comprehensive universal service reform by November 2007, *id.*, and sought comment on comprehensive reform in a public notice, *id.* ¶ 14.

The Commission issued a Notice of Proposed Rulemaking seeking comments on the proposed interim cap, *see In the Matter of High-Cost Universal Serv. Support*, 72 Fed. Reg. 28,936 (proposed May 23, 2007) (to be codified at 47 C.F.R. pt. 54), and after receiving and reviewing 113 sets

of comments, largely adopted the Joint Board's proposal, *see In the Matter of High-Cost Universal Serv. Support*, 73 Fed. Reg. 37,882 (July 2, 2008) (to be codified at 47 C.F.R. pts. 32, 36, 54) (the *Order*). Under the interim cap, annual support for CETCs is capped at the level of support CETCs were eligible to receive in March 2008, subject to two limited exceptions. First, to the extent a CETC files cost data demonstrating its own costs "meet the support threshold in the same manner as the incumbent LEC" in the relevant service area, the CETC is not subject to the interim cap. *Id.* ¶ 31. Second, the cap does not apply to CETCs serving tribal lands or Alaska Native regions. *Id.* ¶ 32. The Commission emphasized the cap would remain in place only until it adopted comprehensive, high-cost universal service reform— reform on which the Commission planned to move forward "in an expeditious manner." *Id.* ¶ 37.

## II

Petitioners challenge the FCC's order imposing the interim cap on high-cost support to CETCs. They claim, among other things, the Commission: (1) violated the notice-and-comment requirements of the APA, 5 U.S.C. § 553; (2) violated § 254 of the Federal Communications Act, 47 U.S.C. § 254; and (3) acted arbitrarily and capriciously in violation of APA § 706(2)(A). We are not persuaded by any of these arguments. Accordingly, having jurisdiction to review the *Order* pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a), we deny the petitions for review.

A. *Rulemaking Challenge*

We begin with petitioners' argument that the Commission violated the notice-and-comment requirements

of the APA. Although the petitioners' arguments are somewhat confusing, we find them all to be without merit.

Petitioners' first claim seems to be that the Commission jumped the gun. It imposed the same interim emergency cap on two individual carriers seeking license transfers that it later imposed on all wireless carriers in the *Order*. *See ALLTEL Corp. & Atlantis Holdings LCC*, 22 F.C.C.R. 19517, 19520–21 (2007); *AT&T Inc. & Dobson Commc'ns Corp.*, 22 F.C.C.R. 20295, 20329 (2007). Neither adjudicatory order imposed *any* obligations or restrictions on parties, including petitioners, other than those directly involved in the mergers. Because petitioners cannot allege any actual injury fairly traceable to either adjudicatory order, they lack standing to raise, and we lack jurisdiction to consider, their challenges to the *Order* on this ground. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Petitioners make an alternative but equally unconvincing argument that the Commission violated the APA. Petitioners claim the Commission's imposition of the same interim cap recommended by the Joint Board and adopted by the Commission in the *ALLTEL* and *AT&T* adjudications proves the notice-and-comment proceedings "served no purpose," since they simply "rubber stamped" a rule change the Commission had already adopted and enforced without the benefit of notice and comment. Br. for Pet'rs 31. Although petitioners once again confuse their argument with inapposite claims that the Commission somehow "circumvent[ed] the APA" by adopting the cap as a condition to the two mergers while the rule was still pending, *see* Reply Br. for Pet'rs 6, it appears their central argument is that the imposition of the cap in the two adjudications demonstrates the Commission was closed-minded about the rule. Furthermore, because the Commission based its decision on "*exactly* the same facts

cited by the Board" and relied on by the Commission in adopting the cap in the two adjudications, petitioners argue the Commission improperly "prejudged" the issue in violation of the APA. *See id.* at 5–8.

Under the APA, a "[g]eneral notice of proposed rule making shall be published in the Federal Register" and "shall include . . . either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). After publishing the required notice, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c). The opportunity for comment must be a meaningful opportunity, *see Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002), and we have held that in order to satisfy this requirement, an agency must also remain sufficiently open-minded, *see, e.g.*, *Fed. Express Corp. v. Mineta*, 373 F.3d 112, 120 (D.C. Cir. 2004); *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988).

Here, the Commission complied with each of the APA's rulemaking requirements. The Commission issued a Notice of Proposed Rulemaking, *see In the Matter of High-Cost Universal Serv. Support*, 72 Fed. Reg. 28,936, compiled a record that included 113 sets of comments from interested parties, considered those comments, and did not issue the *Order* until the required rulemaking process was complete. Nothing else is required.

Numerous commenters expressed support for the rule, and the Commission properly took those views into account when it decided to impose the interim cap. Other commenters opposed the cap or recommended changes to its operation. The Commission likewise took those views into account,

responding throughout the *Order* to specific critiques of the cap. *See, e.g.*, *Order* ¶¶ 11–24. Indeed, the Commission even added an exception to the rule based on the comments. *See, e.g.*, Comments of The Iowa Telecomm. Ass'n on Pub. Notice of May 1, 2007 at 4 (May 31, 2007) (suggesting the Commission base support on CETCs' own costs).

B. *Statutory Language*

Petitioners also raise a number of challenges to the FCC's interpretation and application of § 254 of the Act. Pursuant to the principles outlined in § 254, the Joint Board and the Commission are responsible for developing "specific, predictable and sufficient . . . mechanisms to preserve and advance universal service." 47 U.S.C. § 254(b)(5). Since the principles outlined use "vague, general language," courts have analyzed language in § 254(b) under *Chevron* step two. *See Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 421 (5th Cir. 1999) ("*TOPUC*"). Thus, the question is whether the agency's interpretation is a permissible construction of an ambiguous statute. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). We will uphold the agency's interpretation as long as it is reasonable, *see id.* at 843–44, even if "there may be other reasonable, or even more reasonable, views." *AT&T Corp. v. FCC*, 220 F.3d 607, 621 (D.C. Cir. 2000); *see also MCI Telecomms. Corp. v. FCC*, 675 F.2d 408, 413 (D.C. Cir. 1982).

Petitioners first contend the Commission violated § 254 of the Act by interpreting the statutory principle that there should be "specific, predictable and *sufficient*" USF support, 47 U.S.C. § 254(b)(5) (emphasis added), as also requiring that the fund remain "*sustainable*," *see Order* ¶ 7 (noting the interim cap was necessary until comprehensive reforms are adopted to "ensure that the universal service fund will be

sustainable for future years"). They argue "sustainability" is a principle adopted neither by Congress in § 254(b) nor by the Commission in this or any previous order. We disagree. While it is true the Commission may not "depart from [the principles in § 254(b)] altogether to achieve some other goal," *Qwest Corp. v. FCC*, 258 F.3d 1191, 1200 (10th Cir. 2001) ("*Qwest I*"), we think preservation and sufficiency are just different ways of describing sustainability, *see* 47 U.S.C. § 254(b)(5) (stating "[t]here should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service"). *See* MERRIAM-WEBSTER'S COLLEGIATE THESAURUS 574 (1988). Thus, although "sustainability" is not mentioned in § 254(b), the Commission reasonably interpreted Congress's directive that it "preserve" universal service as also requiring that it "sustain" universal service, which, in turn, requires ensuring the sustainability of the fund.

Petitioners' second argument is that the Commission further violated the Act by reading § 254(b)(5) as requiring that support should be "sufficient, *but not excessive*." *Order* ¶ 9 (emphasis added). They claim such an interpretation elevates the Commission's own goal of preserving the solvency of the USF over Congress's directive in § 254(b)(5) that the fund provide support that is "sufficient" to meet the needs of preserving and advancing universal service. Petitioners apparently think § 254(b)(5) compels the Commission to welcome wretched excess—at least so long as compensating fee exactions can be squeezed out of consumers. But the Commission's analysis goes beyond a narrow view of solvency, concluding "the statutory principle of 'sufficiency' proscribes support in excess of that necessary to achieve the Act's universal service goals." *Order* ¶ 8. Thus, the Commission apparently reasons that "sufficiency" encompasses not just affordability for those benefited, but

fairness for those burdened. The agency seeks to strike an appropriate balance between the interests of widely dispersed consumers with small stakes and a concentrated interest group seeking to increase its already large stake.

Moreover, although this court has specifically addressed neither the meaning of "sufficiency" as the term is used in the Act nor how the Commission should balance the risks of excessive subsidization with the principles set forth in § 254(b), the Commission must consider not only the possibility of pricing some customers out of the market altogether, but the need to limit the burden on customers who continue to maintain telephone service. The Fifth Circuit's reasoning in *Alenco Communications v. FCC*, 201 F.3d 608, is instructive. In *Alenco*, the Fifth Circuit upheld the Commission's decision to impose a prophylactic cap on USF growth, much like the cap at issue in this case. *Id.* at 625. The court acknowledged "[t]he agency's broad discretion to provide sufficient universal service funding includes the decision to impose cost controls to avoid excessive expenditures that will detract from universal service." *Id.* at 620–21; *see also Qwest I*, 258 F.3d at 1200 (noting the Commission's "discretion to balance the principles [in § 254(b)] against one another when they conflict"). *Alenco*, therefore, underscores the error of petitioners' fundamental position that the Commission may not take measures to guard against "excessive" USF contributions when deciding how best to administer the program. Expounding on the proper interpretation of "sufficient" as used in § 254(b), the Fifth Circuit noted "excessive funding may itself violate the sufficiency requirements of the Act" by "detract[ing] from universal service by causing rates unnecessarily to rise, thereby pricing some consumers out of the market." *Alenco*, 201 F.3d at 620; *see also Qwest Commc'ns Int'l Inc. v. FCC*, 398 F.3d 1222, 1234 (10th Cir. 2005) (noting "excessive

subsidization arguably may affect the affordability of telecommunications services, thus violating the principle in § 254(b)(1)"). The court thus recognized the principle of providing sufficient funding mechanisms to advance universal service, 47 U.S.C. § 254(b)(5), may need to be balanced against the principle of affordability for consumers, *id.* § 254(b)(1).

The Commission enjoys broad discretion when conducting exactly this type of balancing. *See Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999) ("When an agency must balance a number of potentially conflicting [statutory] objectives . . . judicial review is limited to determining whether the agency's decision reasonably advances at least one of those objectives and its decisionmaking process was regular."); *see also TOPUC*, 183 F.3d at 434, 436 (noting the Commission's "considerable amount of discretion" to balance "the competing concerns set forth in § 254(b)" and the "substantial amount of deference" the Commission should be accorded when interpreting the term "sufficient"). Moreover, it is hard to imagine how the Commission could achieve the overall goal of § 254—the "preservation and advancement of universal service," 47 U.S.C. § 254(b)—if the USF is "sufficient" for purposes of § 254(b)(5), yet so large it actually makes telecommunications services less "affordable," in contravention of § 254(b)(1). That the Commission, in the face of evidence showing providers were receiving subsidies in excess of what is needed to allow them to remain in the market, chose to consider its interest in avoiding excessive funding from consumers was thus entirely reasonable.[1]

---

[1] We conclude here only that it was reasonable for the Commission to consider the competing principle of "affordability" in its decision to impose the interim cap. We withhold until Section

In any event, petitioners have failed to demonstrate their high-cost support would actually be insufficient under the interim cap. The pertinent question is whether the interim cap will undercut adequate telephone services for customers, since "[t]he purpose of universal service is to benefit the customer, not the carrier." *Alenco*, 201 F.3d at 621. Petitioners, however, seem to ignore this fact in their cry for more subsidies, which they have failed to prove are necessary to provide basic service to customers who have none. Petitioners include no cost data showing they would, in fact, have to leave customers without service as a result of the cap and therefore give us no valid reason to believe the principle of "sufficiency," even viewed in isolation, will be violated by the cap.

Furthermore, the Commission created an exception to the cap. To the extent a CETC believes its capped support is insufficient, the *Order* permits the CETC to obtain an exemption upon "fil[ing] cost data demonstrating that its costs meet the support threshold in the same manner as the incumbent LEC." *Order* ¶ 31. There is no reason to believe—and petitioners have offered no data proving—that support under the cap will be insufficient. Thus, the limits imposed by the interim cap seem unlikely to deprive any CETCs' customers of service, while they are almost sure to reduce the CETCs' profits. Conveniently, both petitioners and their amicus fail to mention the exemption provision even a single time in their briefing. However, at oral argument, counsel for petitioners, when pressed on the significance of

---

II.C our analysis of the reasonableness of the Commission's conclusion that failure to impose the cap would, in fact, render the USF unsustainable and require excessive contributions from consumers.

the exception, characterized it as merely a "side door" that effectively achieves nothing since there is no "accounting mechanism" in place for wireless carriers to calculate their costs. Although we need not consider this belated complaint, we think it not unreasonable for the Commission to ask that providers be prepared to calculate their own costs.

We are equally unpersuaded by petitioners' final statutory argument that the Commission's decision to impose the cap only on CETCs violates the Commission's principle of competitive neutrality and that the Commission also violated the Act by elevating its principle of "sustainability" over the principle of competitive neutrality. CETCs enjoy a significant advantage over ILECs under the current support system. Under the identical support rule, as the ILEC loses lines while its fixed costs remain approximately the same, the CETC receives higher support per line for each line it takes from the ILEC. Moreover, since the current regime appears to count each line and handset the same based on the ILEC's costs, CETCs receive subsidies well in excess of their costs. Thus, as the Commission noted in its *Order*, wireless CETCs have an "incentive to expand the number of subscribers . . . located in the lower-cost parts of high-cost areas, rather than to expand the geographic scope of their network." *Id.* ¶ 21.

As a result of these inequities and inefficiencies that exist under the current regime, the source of the rapid growth of the USF fund is also unbalanced. Support to ILECs has been flat since 2003, *see id.* ¶ 6, and has even declined since 2005, *id.* ¶ 6 n.25. Moreover, most ILEC support mechanisms are already capped or subject to growth limits. *Id.* ¶ 10. Support to CETCs, on the other hand, grew from $17 million to $1.18 billion in the six years from 2001 to 2007. *Id.* ¶ 6. The evidence thus reveals it is CETC support, *not* ILEC support

that is exerting pressure on the USF and therefore poses the most direct threat to the fund's sustainability.

The competitive neutrality principle requires that "universal service support mechanisms and rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another." *In the Matter of Fed.-State Joint Bd. on Universal Serv.*, 12 F.C.C.R. 8776 ¶ 47. The rule thus only prohibits the Commission from treating competitors differently in "unfair" ways. Based on the Commission's findings that CETCs and not ILECs were responsible for the surge in costs, a solution targeting only CETCs was hardly unfair. Moreover, although the rule does not require the Commission to provide the exact same levels of support to all ETCs, *see, e.g.*, *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 80 (2d Cir. 2002) (noting competitive neutrality "does not require precise parity of treatment"), to the extent a CETC believes it *should* be entitled to greater per-line high-cost support than the amount disbursed under the cap, the *Order* permits the CETC to obtain an exception upon "fil[ing] cost data demonstrating that its costs meet the support threshold in the same manner as the incumbent LEC." *Order* ¶ 31. If a CETC is not able to make this showing, the argument that reducing its support below that of the ILEC violates the principle of competitive neutrality has little force.

## C. *Arbitrary and Capricious*

We turn last to petitioners' claim that the Commission's decision to impose the interim cap was arbitrary and capricious. Unlike *Chevron* step two review, which focuses on whether the agency's interpretation was reasonable, "arbitrary and capricious" review focuses on the reasonableness of the agency's decisionmaking processes.

The standard is very deferential. Unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or not supported by "substantial evidence," we will uphold an agency's final order. 5 U.S.C. § 706(2); *see also Arent v. Shalala*, 70 F.3d 610, 614–16 (D.C. Cir. 1995). Our role in this regard is a limited one, and we will not substitute our judgment for that of the agency. *See Sprint Nextel Corp. v. FCC*, 524 F.3d 253, 257 (D.C. Cir. 2008). The Commission need only articulate a "'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).

The "arbitrary and capricious" standard is particularly deferential in matters implicating predictive judgments and interim regulations. *See, e.g.*, *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006); *MCI Telecomms. Corp. v. FCC*, 750 F.2d 135, 140 (D.C. Cir. 1984); *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 813–14 (1978). Where, as here, the FCC must make predictive judgments about the effects of increasing subsidies, certainty is impossible. The Commission therefore relied on its expertise to evaluate the existing evidence and decide whether the risk of harm to the universal support system was large or important enough to merit immediate regulatory action. The Commission concluded it was and predicted a crisis would ensue if it procrastinated. *See Order* ¶ 22 (noting "[t]o avert this crisis, it is necessary to place some temporary restraints on the fastest-growing portion of high-cost support, i.e., competitive ETC support"). In circumstances involving agency predictions of uncertain future events, "'complete factual support in the record for the Commission's judgment or prediction is not possible or required'" since "'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the

agency.'" *Melcher v. FCC*, 134 F.3d 1143, 1151 (D.C. Cir. 1998) (quoting *FPC v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 29 (1961)). Thus, when an agency's decision is primarily predictive, our role is limited; we require only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive. *See id.* at 1152.

This court has also acknowledged the FCC should be given "substantial deference" when acting to impose interim regulations. *See, e.g.*, *MCI Telecomms. Corp.*, 750 F.2d at 141 ("Substantial deference must be accorded an agency when it acts to maintain the status quo so that the objectives of a pending rulemaking proceeding will not be frustrated."). Accordingly, we have repeatedly held that "[a]voidance of market disruption pending broader reforms is, of course, a standard and accepted justification for a temporary rule." *Competitive Telcomms. Ass'n v. FCC*, 309 F.3d 8, 14 (D.C. Cir. 2002) ("*CompTel 2002*"); *see also ACS of Anchorage, Inc. v. FCC*, 290 F.3d 403, 410 (D.C. Cir. 2002); *MCI Telecomms.*, 750 F.2d at 141. The Commission here recognized that comprehensive reform aimed at making universal support subsidies truly cost-based and correcting the inequities and inefficiencies that have resulted from the identical support rule is essential. *See Order* ¶¶ 4, 21. However, the Commission also recognized the irreparable harm to the USF and the telecommunications markets generally that might result from waiting until comprehensive reform, which is often complex and difficult to achieve, was adopted. Courts, including this one, have deferred to the Commission's decisions to enact interim rules based on its predictive judgment that such rules were necessary to preserve universal service. *See, e.g.*, *CompTel 2002*, 309 F.3d at 14–15; *Alenco*, 201 F.3d at 620–22; *Southwestern Bell Tel. Co. v. FCC*, 153 F.3d 523, 537–39, 549–50 (8th Cir. 1998).

The Commission stated specifically that "[t]he interim cap will remain in place only until the Commission adopts comprehensive, high-cost universal service reform," on which it promised to move forward "in an expeditious manner." *Order* ¶¶ 23, 37. We trust the Commission's assurances today. However, should the Commission fail to fulfill its obligations, additional and more searching judicial review may be appropriate. *Compare CompTel 2002*, 309 F.3d at 14–16 (upholding interim FCC rules adopted to avoid disruption pending broader reform to make access charges truly cost-based and eliminate implicit subsidies), *with Competitive Telecomms. Ass'n v. FCC*, 87 F.3d 522, 530, 531–32 (D.C. Cir. 1996) (refusing to uphold an "interim" rule that perpetuated non-cost-based access charges and had been in place for thirteen years without any "discernable progress" by the FCC to "transition" to a fully cost-based system).

The crux of petitioners' challenge to the reasonableness of the Commission's imposition of the interim cap is that the record before the Commission did not contain substantial evidence indicating a "growing crisis" in high-cost support. Specifically, petitioners complain the Commission (1) relied on the Joint Board's incorrect estimates of future CETC support levels; (2) drew unreasonable conclusions about the sustainability of the fund based on past growth rates of CETC support; and (3) proffered no evidence to show USF funding was actually causing rate increases that might price consumers out of the market. Petitioners also argue the Commission failed to explain its rejection of an alternative solution. None of their arguments persuade us the Commission's decision was arbitrary and capricious.

First, petitioners attack the Joint Board's faulty estimate that CETC support would reach almost $2 billion in 2008 and $2.5 billion in 2009. CETC support in fact only grew to

$1.31 billion in 2008.  But that error raises no concern.  We are reviewing the Commission's decision, *not* the Joint Board's, and the Commission did not rely on the Board's future growth estimates for 2008 or 2009 in imposing the interim cap.  In fact, the Commission never referenced the Board's specific growth predictions in the *Order*.  Instead, the Commission relied on undisputed historical high-cost support figures showing CETC high-cost support had ballooned from $17 million in 2001 to $1.18 billion in 2007 to conclude future growth at that rate might threaten both the sustainability of the USF and the affordability of telecommunications services.  *See Order* ¶¶ 6, 22.  Moreover, even if the Commission had relied on the Board's forecasts, we judge the reasonableness of an agency's decision on the basis of the record before the agency at the time it made its decision.  *See Fresno Mobile Radio*, 165 F.3d at 971.  Whether an agency's decision turns out to be mistaken *ex post* is of limited significance.

Petitioners also argue the annual rate at which high-cost support disbursements grew actually *decreased* every year since 2003 and thus claim the Commission had no rational basis to predict CETC support would more than double each year, *see Order* ¶ 6.  Petitioners, however, misconstrue the Commission's reliance on the average annual growth rate of CETC support.  Although the Commission did state that the "over 100 percent" average annual growth rate in CETC support between 2001 and 2007 was "not sustainable," *id.*, the Commission also noted the growth rate of high-cost support, in the aggregate, would "render the amount of high-cost support unsustainable and could cripple the universal service fund," *id.* ¶ 22.  Admittedly, the Commission could have been clearer about the evidence supporting its prediction of unsustainability.  However, even if the Commission did base its conclusion, in part, on predictions about the average

annual growth rate of CETC support, the declines since 2003 do not undermine the reasonableness of the Commission's decision—a slower rate of growth on a larger base ($1.18 billion CETC high-cost support in 2007) in this instance results in a greater impact on total size of the USF than does a faster rate of growth on a smaller base ($17 million in 2001).

Along with their attack on the Commission's predictions about the sustainability of the fund, petitioners also argue there is no apparent correlation between the annual growth rate of CETC high-cost support and the growth of total USF disbursements to all four programs the fund supports. The Commission's claim that the recent growth in total USF disbursements is correlated to CETC support seems quite straightforward: if one component of the total is growing rapidly, the total will grow rapidly unless there are offsetting declines in other components. Two of the other three USF programs are already subject to annual funding caps, *see* 47 C.F.R. § 54.507(a) (schools and libraries program); 47 C.F.R. § 54.623 (rural health care program), and the other program, low-income support, although not capped, did not grow at an alarming rate from 2001 to 2007, *see* UNIVERSAL SERVICE MONITORING REPORT tbl.2.2. Thus, it is clear high-cost support, which has grown by $1.7 billion in the past six years, is the driving force behind the growth in total USF support. Moreover, the growth in high-cost support is clearly attributable to CETCs, since ILEC support has actually declined since 2005, *see Order* ¶ 6 n.25. While the Commission may have failed to include all the facts and figures underlying its conclusion, its analysis is sufficient, especially given the deferential lens through which we review its decision.

Petitioners further argue the Commission failed to show consumer contributions have been, or would be, "excessive"

absent the cap and the Commission disregarded data showing that, even if CETC support doubled to $2 billion in 2008, the impact on consumers' monthly wireless bill would still be negligible. With respect to petitioners' first argument, the Commission relied on two separate pieces of evidence in concluding continued growth of the fund would require "excessive (and ever growing) contributions from consumers." *Id.* ¶ 6. First, the Commission noted the contribution factor had reached 11.7% in 2007, its highest level since its inception. *Id.* ¶ 6 n.27. Second, the Commission noted the fund had grown at an alarming rate over the past seven years, and support for the fund comes from assessments paid by telecommunications providers, who can, and almost always do, pass the cost of those assessments to their customers. *Id.*; *see also Alenco*, 201 F.3d at 620. The Commission thus logically concluded consumer contribution rates would also increase at an alarming rate to keep up with the growth in the fund. Given the substantial deference we afford agencies' predictive judgments, the dramatic increase in CETC high-cost support, on its own, was enough to justify the Commission's prediction about the effect on consumers.

Even if CETC support doubled to $2 billion in 2008, petitioners argue, the impact on consumers' monthly wireless bill would still be a negligible increase of 31 cents for consumers with a monthly bill of $50.00. As counsel for the Commission pointed out at oral argument, however, petitioners' estimates are misleading. Other carriers proffered larger projected increases. We think the Commission, having a more comprehensive perspective than the court or the petitioners about the elasticity of demand for phone services, is in the best position to determine how large an increase is too much. Indeed, in light of the Commission's concern that unneeded subsidies are driving up costs for consumers of modest means, we think the Commission's policy decision to

place a limit on the extraction of funds from ordinary people for an unnecessary subsidy is clearly entitled to deference.

Lastly, petitioners argue the Commission's decision was arbitrary and capricious because the Commission failed to explain its rejection of a reasonable alternative to imposing the interim cap. The Commission, they argue, could have simply "shoveled the interim cap matter off to die quietly in the comprehensive reform proceeding." Br. for Pet'rs 42. As discussed, the Commission enjoys broad discretion in exercising its predictive judgment to determine the point at which the USF might become so large as to risk making basic telephone services unaffordable. It follows that the Commission also enjoys broad discretion to determine the point at which it must take immediate action to prevent irreversible damage to the fund, consumers, and the telecommunications market generally. Thus, armed with its own expertise and considered judgment, the Commission reasonably concluded "shovel[ing]" the matter off to "die quietly" was not a wise option.

It is true the Commission could simply shift the increasing burden of high-cost support around for another decade. It could allow high-cost support to grow without limit and fuel a commensurate increase in low-income support for marginal consumers facing higher and higher costs. But as the Commission recognized, that strategy is not sustainable. Accordingly, the Commission acted reasonably by adopting a prophylactic tool it has used numerous times before to control USF growth. Given the heightened deference enjoyed by both interim orders and predictive judgments, we have no basis for finding the FCC acted arbitrarily and capriciously.

For the foregoing reasons, the petitions for review are

*Denied.*