# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 18, 2020   Decided October 9, 2020

No. 19-5284

THE AMERICAN COUNCIL OF THE BLIND AND PATRICK
SHEEHAN,
APPELLANTS

OTIS STEPHENS,
APPELLEE

v.

STEVEN T. MNUCHIN, SECRETARY OF THE TREASURY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:02-cv-00864)

*Jeffrey A. Lovitky* argued the cause and filed the briefs for appellants.

*Daniel Winik*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Ethan P. Davis*, Acting Assistant Attorney General, and *Charles W. Scarborough*, Attorney.

Before: HENDERSON and WALKER, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Under the terms of a 2008 injunction, the Secretary of the United States Department of the Treasury (Treasury) must make the various Federal Reserve Notes distinguishable to the visually impaired no later than the next scheduled redesign of each denomination. These redesigns have been significantly delayed. In 2016, the American Council of the Blind (Council) moved to impose a firm deadline on the Secretary. The district court denied the motion, we vacated its order and on remand the district court denied a similar motion. The Council challenges this most recent denial on two grounds. *First*, it argues that the district court relied on Treasury's financial burden without obtaining "concrete estimates" of that burden, thereby violating our mandate in *American Council of the Blind v. Mnuchin*, 878 F.3d 360 (D.C. Cir. 2017) (*ACB II*). *Second*, the Council contends that the district court abused its discretion because its decision lacked evidentiary support. We disagree on both points and affirm the district court.

## I. BACKGROUND

Federal Reserve Notes—that is, U.S. paper currency—are identical in size and texture and nearly identical in color. These characteristics make using paper currency difficult for individuals who are blind or nearly blind. In 2002, the Council sued the Treasury Secretary, alleging that the design of U.S. paper currency violates the Rehabilitation Act, 29 U.S.C. § 794, by denying a reasonable accommodation to the visually impaired. So began a nearly two decades-long litigation odyssey.

In 2006, the Council won partial summary judgment, *see Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51 (D.D.C. 2006), which we affirmed, *see* 525 F.3d 1256 (D.C.

Cir. 2008) (*ACB I*).  On remand, the district court disclaimed both the "expertise" and the "power" to "choose among the feasible alternatives, approve any specific design change, or otherwise to dictate to the Secretary of the Treasury how he can come into compliance with the law."  581 F. Supp. 2d 1, 2 (D.D.C. 2008) (quoting *Paulson*, 463 F. Supp. 2d at 62).  Thus, the district court's injunction—currently in force—required the Secretary to take:

> such steps as may be required to provide meaningful access to United States currency for blind and other visually impaired persons, which steps shall be completed, in connection with each denomination of currency, not later than the date when a redesign of that denomination is next approved by the Secretary of the Treasury.

In response, Treasury developed a three-pronged plan for providing meaningful access to currency.  *See* Meaningful Access to United States Currency for Blind and Visually Impaired Persons, 75 Fed. Reg. 28,331 (proposed May 20, 2010).  *First*, the Bureau of Engraving and Printing (Bureau) would produce new banknotes with a raised tactile feature (RTF).  *Second*, the Bureau would continue its project, begun in 1997, of incorporating large, high-contrast numerals on new currency.  *Third*, the Bureau would distribute handheld currency readers to the visually impaired.

Although the Bureau has made some progress on the second and third approaches, it has had little success developing an RTF.  The Secretary set four goals for selecting an RTF: *accuracy* (the RTF must effectively allow the visually impaired to distinguish among denominations), *manufacturability* (it must be able to be produced in massive

quantities), *durability* (it must not degrade prematurely) and *processability* (it must be capable of being processed by currency counting machines, vending machines, ATMs, etc.). The Bureau contends that balancing these factors is daunting; for example, larger, thicker RTFs may increase accuracy and durability while sacrificing manufacturability and processability.

In addition to the RTF's technical challenges, advances in counterfeiting have also pushed back the expected timeline for the accessibility redesign.[1] Under the 2008 injunction, the accessibility redesign is coupled with the security redesign. In 2012, the Bureau director attested that the expected accessibility timeline would not be met because of unexpected delays redesigning the $100 note to incorporate new anticounterfeiting technologies. Later, in a 2016 status report, Treasury said that it had "recently learned of significant developments in counterfeiting technology that bear upon the long-term effectiveness of the security features" it had planned on integrating into new notes. This setback necessitated the design and development of new security features.

The 2008 injunction was premised on the expectation that each denomination would be redesigned every seven to ten years. Treasury's most recent timeline contemplates that the required accessibility redesigns may not be completed until the 2030s—some three decades after the district court first found that Treasury was in violation of federal law. Understandably

---

[1] The original timeline for the $5 note redesign was 2015–2018 but—as of 2017—the new timeline is 2028. Other notes are facing similar or greater delays. For the $10 note, 2013–2016 has become 2026. For the $20 note, 2010–2013 has become 2030. For the $50 note, 2011– 2014 has become 2032–2035. And for the $100 note, which was not included in the original injunction, the expected timeline is 2034–2038.

frustrated with the delays, the Council moved under Rule 60(b) to modify the injunction to a "deadline of December 31, 2020 by which date the Secretary must provide meaningful access to the $10 bill, which is the next bill scheduled to be redesigned." The Council further requested that the modified injunction require the Secretary "to make the remaining denominations of currency accessible to the blind and visually impaired not later than December 31, 2026." In sum, whereas the existing injunction couples the security and accessibility redesigns—relying on Treasury's emphasis on the former to also produce the latter—the Council's proposal decouples the redesigns and forces the accessibility redesign by a specific date.

The district court denied the Rule 60(b) motion, concluding that decoupling the redesigns "could create unnecessarily duplicative work and potentially increase costs for both the government and the private sector." *Am. Council of the Blind v. Lew*, No. 02-CV-00864, 2017 WL 6271264, at *2 (D.D.C. Jan. 6, 2017). In *ACB II*, we reversed. Because the district court relied on the financial burden imposed by the requested relief without obtaining a concrete estimate of that burden, we concluded that it had abused its discretion. *See* 878 F.3d at 371. Our holding was straightforward:

> If the district court is to properly conclude that withholding meaningful access to paper currency from millions of visually impaired individuals for eight to twenty years longer than expected . . . remains equitable because of the potential financial burden resulting from granting the plaintiffs' modification, the district court needs more concrete estimates of the costs that matter.

*Id.*

On remand, the Council again moved to modify the injunction to require Treasury to provide meaningful access to the $10 note by the end of 2020 and to the other denominations by the end of 2026. Treasury opposed the motion. In addition, the Bureau expressed doubt about the efficacy of the three-pronged approach it had begun to develop in 2010. For example, a MITRE Corporation study showed significant percentages of experienced Braille readers were unable to correctly identify currency with an RTF. And because Braille readers were over-represented in the study compared to the overall population of visually impaired individuals, there was, in the Bureau's opinion, reason to believe that real-world results would be even worse. This was the factual background for the Bureau's December 2018 status report expressing "concerns regarding its ability to create a tactile feature for U.S. currency with an accuracy rate that will make it suitable for reliable use in commerce."

In any event, the district court again denied the Council's motion but for ostensibly different reasons from those we rejected in *ACB II*. *See Am. Council of the Blind v. Mnuchin*, 396 F. Supp. 3d 147 (D.D.C. 2019). *First*, it found that decoupling the accessibility and security redesign "would divert Treasury resources and attention from pressing anti-counterfeiting measures." *Id.* at 189. *Second*, the court opined that the Council's proposed modification would require Treasury to begin immediately incorporating RTFs into U.S. currency, notwithstanding no suitable RTF is currently available. *Id.* at 193–97. The Council now appeals that decision.

## II. ANALYSIS

We review the district court's denial of a Rule 60(b) motion for abuse of discretion. *See Pigford v. Johanns*, 416

F.3d 12, 16 (D.C. Cir. 2005). Under this standard, we reverse "if the district court applied the wrong legal standard or relied on clearly erroneous findings of fact." *In re Vitamins Antitrust Class Actions*, 327 F.3d 1207, 1209 (D.C. Cir. 2003). The district court also abuses its discretion if it violates the mandate of the court of appeals. *See United States v. Kpodi*, 888 F.3d 486, 491 (D.C. Cir. 2018).

In denying the Council's motion to modify the injunction, the district court was persuaded by two considerations: security and feasibility. Although those considerations can be indirectly affected by additional resources, they are distinguishable from the direct financial burden the district court considered in *ACB II*. The question, then, is whether they *should* be distinguished or whether our holding should be read more broadly. Both the language we used in *ACB II* and the purpose of the mandate rule counsel against concluding that the district court violated our mandate. Of course, we do not affirm merely because the court below did not violate the law of the case; its rationale must also be supported by record evidence. We conclude that it is.

## A.

An "inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Pa. R.R. Co.*, 334 U.S. 304, 306 (1948). The so-called "mandate rule" is a "more powerful version of the law-of-the-case doctrine, which prevents courts from reconsidering issues that have already been decided in the same case." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 597 (D.C. Cir. 2001) (internal quotation marks omitted). In other words, the district court cannot "fashion[] a remedy that is 'inconsistent with either the spirit or express terms'" of our holding. *Ass'n of Am. R.Rs. v. Dep't of Transp.*, 896 F.3d 539, 554 (D.C. Cir. 2018)

(Tatel, J., dissenting) (quoting *Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979)).  The obligation to follow past mandates is especially compelling in long-running litigation.  *See Morley v. C.I.A.*, 894 F.3d 389, 401 (D.C. Cir. 2018) (per curiam) (Henderson, J., dissenting).

The district court violated neither the letter nor spirit of our mandate in *ACB II*.  Its first rationale in denying the Council's motion is that the Council's proposed modification would "divert Treasury resources and attention" from its anti-counterfeiting responsibilities, thereby "posing risks to the global security of U.S. currency with concomitant serious ramifications for consumers, businesses, and the health of the global economy."  396 F. Supp. 3d at 189–90.  The Council argues that this concern necessarily implicated the financial burden of its proposal, which means the district court should have required concrete estimates of the costs involved in adopting its proposal.

There is a certain logic to the Council's argument.  Almost *any* concern about financial burden could be reframed in terms of a resource constraint.  "I can't afford the gas for the trip," for example, can be reframed as "I don't have enough gas to make the trip."  Unless it is physically impossible to refill the gas tank, the two statements are different ways of phrasing the same thought.  It would violate the spirit of *ACB II*'s mandate if the district court, possessing no new cost estimates, merely rephrased its earlier decision but left its logic unaltered.

Whether this accurately describes the district court's decision depends on whether we adopt a narrow or broad reading of *ACB II*.  On the narrow reading, *ACB II*'s holding prevented the district court from basing its decision on direct financial costs without having concrete estimates of the direct costs involved.  Adopting this view, the Secretary points out

that the district court did not say "conducting separate security and accessibility redesigns would be costlier than conducting a single redesign" but instead that "the Bureau can do only so many things at once." On the broad understanding, however, our holding extended to any rationale open to cost analysis.

Looking at both the language we used in *ACB II* and the underlying logic behind the mandate rule, we adopt the narrow understanding. The phrase "financial burden" means something specific to most speakers and audiences. Although any obstacle short of pure impossibility can be framed as a financial obstacle, a financial burden usually refers to costs within a fixed budgetary framework rather than quality or timeline obstacles that might theoretically be solved with an unlimited budget. The district court found that a short-term prioritization of the accessibility redesign by itself could impair the Secretary's ability to execute a timely security redesign. *See* 396 F. Supp. 3d at 189–91. Because the Congress, not the Secretary, determines the resources at the Secretary's disposal, this point is logically different from the justification we rejected in *ACB II*. The district court's security rationale is a management consideration, not a budgetary one.

The distinction between management, i.e., policy, and budgetary considerations may be somewhat artificial but it is recognized in other areas of the law. In Federal Tort Claims Act cases, for example, the "discretionary function exception" to liability is implicated if the government's action is "susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991). In a "reverse" context, sister circuits have held that a financial consideration is not necessarily a policy consideration. As the Ninth Circuit noted, "[b]udgetary constraints underlie virtually all governmental activity" so the fact that government employees are required to "work within a budget" does not turn every government action into a policy

decision. *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195–96 (9th Cir. 1987). Similarly, the Eleventh Circuit recognized that "financial considerations alone may not make a decision one involving policy." *Hughes v. United States*, 110 F.3d 765, 769 (11th Cir. 1997). Here, we make the corollary point: a policy consideration is not synonymous with a financial one, even if there is substantial overlap.

The purpose of the mandate rule also supports a narrow reading. The mandate rule is a doctrine of judicial administration; its goal is to "achieve finality," making it possible for appellate courts to do their job. *Greater Bos. Television Corp. v. F.C.C.*, 463 F.2d 268, 279 (D.C. Cir. 1971). The law of the case doctrine—of which the mandate rule is a species—"does not seek to sweep under its coverage all possible issues arising out of the facts of the case." *U.S. ex rel. Dep't of Labor v. Ins. Co. of N. Am.*, 131 F.3d 1037, 1041 (D.C. Cir. 1997). Although there may be good reason to compel the district court to quantify its security rationale in dollar-denominated terms, *ACB II* does not require it.

The district court's feasibility rationale also comports with *ACB II*'s mandate. The court was persuaded that the Council's proposed modification would require circulating an RTF even though no RTF has met the Bureau's circulation benchmarks. *See* 396 F. Supp. 3d at 193–98. The Council replies that this all translates into financial burden (meaning the district court needed a concrete estimate of that burden). Its logic works something like this: because the effectiveness of an RTF is "largely a question of size," the Bureau could comply with the proposed deadline simply by making the RTF larger. By effectiveness, we understand the Council to mean *accuracy*, which is only one of the Bureau's four benchmarks. In the Council's view, however, the other benchmarks—manufacturability, durability and processability—are solely

economic concerns. Lack of durability could be resolved through more frequent currency replacement and lack of processability could be resolved by retrofitting existing cash-processing machines. But, as we noted earlier, *ACB II* should not be read to encompass any policy tradeoff that could be theoretically improved with infinite resources. The Secretary's decision to pursue an RTF that meets all four of its benchmarks is nothing if not a policy decision. We therefore reject the Council's suggestion that the district court's feasibility rationale can be boiled down to financial burden.

That the district court met *ACB II*'s mandate does not decide whether the district court abused its discretion for some other reason—a question we take up next.

**B.**

Rule 60(b) provides that, upon motion, the court may relieve a party of an injunction if "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The district court should grant a Rule 60(b) motion if "a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest." *Horne v. Flores*, 557 U.S. 433, 447 (2009) (internal quotation marks omitted). The Secretary does not dispute that circumstances have changed. In *ACB II*, after all, we recognized that a "much greater than planned delay in providing meaningful access to visually impaired individuals is unquestionably a change in factual conditions." 878 F.3d at 366–67. The issue is whether this change renders enforcement of the 2008 injunction "detrimental to the public interest." The Council has the burden of proving that it does. *See Horne*, 557 U.S. at 447.

The district court's rationales for denying the Council's motion are sufficiently supported by the record. In setting out its security rationale, the district court cited the Secretary's

estimate that adding the RTF to the $10 note by the end of 2020 would likely push back the security redesign of each denomination by at least two years—possibly more. *See* 396 F. Supp. 3d at 191 n.42. The Council's only direct rebuttal is that "neither the Secretary nor the district court explains the counter-intuitive conclusion that imposing an obligation to complete a task by the end of 2020 would somehow necessitate a delay to an event that is not scheduled to be completed" until 2026.

But the Secretary did explain his conclusion. In response to an interrogatory from the district court, the Secretary noted that "[t]he incorporation of an RTF would necessarily affect the overall design of the bills, and thus would affect the design of each denomination, including potentially the effectiveness of security features." The complexity of this interaction means that "[t]here is no way to predict the results of this testing, and, if notes containing any feature failed the testing, there is no way to predict how much additional development and testing would be required." In other words, each new feature—accessibility- or security-related—requires extensive testing and may interact with existing features in unpredictable ways; this requires an irreducible amount of testing, no matter how distant the deadline.

The Secretary's conclusion appears to be the result of a hard-learned lesson. The most recently released note, the $100 note, was delayed for over three years after the Bureau determined that the new security ribbons were producing creases that made the notes unusable. Worse, this defect was only discovered after large-scale production was underway. A later review concluded that the Bureau had engaged in "insufficient preproduction testing." The district court cited the Secretary's statement in support of its conclusion that the harm of a later than expected accessibility redesign does not

justify the risks of "delaying an already postponed security redesign even further." 396 F. Supp. 3d at 190; *id.* n.41. It was not an abuse of discretion for the district court to credit the Secretary's estimate and weigh the tradeoffs as it did.

Granted, we do not know much about how the Secretary derived his estimate of a two-year delay in the security redesign. The estimate is "concrete" but it may fail to fully live up to the "show your work" spirit that animated *ACB II*. Nonetheless, the Secretary's estimate is a predictive judgment that "involves deductions based on the expert knowledge of the agency" and therefore does not—if, indeed, it can—require "complete factual support in the record." *Rural Cellular Ass'n v. F.C.C.*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) (quoting *Melcher v. F.C.C.*, 134 F.3d 1143, 1151 (D.C. Cir. 1998)). Additionally, the estimate does not stand to benefit from quantitative support in the same way as a cost-based rationale. Budgetary calculations, after all, are uniquely susceptible to line-by-line disaggregation. And our caselaw rejects the notion that the only acceptable agency analyses are quantitative. *See*, *e.g.*, *Am. Farm Bureau Fed'n v. E.P.A.*, 559 F.3d 512, 535 (D.C. Cir. 2009) ("[T]he fact that the EPA's analysis is qualitative rather than quantitative does not undermine its validity."); *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 611 (D.C. Cir. 2015) ("Our decisions afford greater leeway to Interior to evaluate qualitatively costs that are difficult to quantify.").

The district court's feasibility rationale is also well-supported by the record. The Council does not contest that no RTF feature is currently available. Instead, its primary rebuttal is that today's RTF difficulties do not suggest that one cannot be ready for circulation by December 31, 2026. In other words, December 2026 is a long time away so how can the court be certain that the Council's proposed deadline is infeasible? But

this flips the burden: it is the responsibility of the Council, as the moving party, to justify the modification. And in any event, it was not an abuse of discretion for the district court not to compel the Secretary to take an action that *might* be possible.

The Council's attack on the feasibility rationale is wrong for an additional reason—one that strikes at the heart of our institutional role. When the Council insists that the Secretary could approve a short-term solution, such as notches or paper roughening, neither of which has been approved by the Bureau's experts, or when it suggests functionally eliminating three of the Bureau's four requirements for a successful RTF, it seeks not merely to compel the Secretary to comply with the law but to exercise control over the manner in which he must do so.

Like the district court in 2008, we have serious doubts about the authority of a court to compel the Secretary to implement any specific design feature. *See Paulson*, 581 F. Supp. 2d at 2. The Congress charged *the Secretary* with "furnish[ing] suitable notes for circulation . . . in the best manner to guard against counterfeits and fraudulent alterations." 12 U.S.C. § 418. The Bureau carries out this responsibility under the direction of the Secretary, who has the authority to direct the "form and tenor" of each note. *Id.* Nothing in federal law gives us the authority to require that U.S. currency take a particular form. "Courts have no license to usurp from agencies the discretion that Congress has granted them." 33 Charles A. Wright, Charles H. Koch, Jr., and Richard Murphy, *Federal Practice and Procedure* § 8384 (2018); *cf. Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004) (holding, in APA context, federal court can compel agency to take only *discrete* actions it is *required* to take). And even if we had the authority, it is a task for which we lack expertise.

15

It would be odd if this court, while eschewing the intention to require any specific design, imposed a timetable that necessarily compelled a particular design or forced the Bureau to abandon plans for its preferred design. Such an action would violate "the principle that courts should not impose remedies that interfere with an agency's proper discretion." Wright, Koch & Murphy, *supra*, § 8384. Thus, we are not swayed by the Council's suggestion that "other viable alternatives" to RTF "have never been considered by the Secretary." Instead, we think the district court was wise to abide by the principle that an "agency's own timetable for performing its duties in the absence of a statutory deadline is due 'considerable deference.'" *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001) (quoting *Sierra Club v. Gorsuch*, 715 F.2d 653, 658 (D.C. Cir. 1983)); *see also Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (same); *Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 712 (D.C. Cir. 1974) ("The courts cannot responsibly mandate flat guideline deadlines when the Administrator demonstrates that additional time is necessary.").

We sympathize with the Council's frustration on behalf of those it has so faithfully represented. As the Council said in its initial complaint over 18 years ago, "individuals with visual disabilities suffer needless impediments in purchasing groceries, transportation, and a multitude of other goods and services" and are at "heightened risk of fraud and deceit." Because Treasury has yet to comply with federal law, "millions of visually impaired individuals" remain largely "dependent on the kindness of others" to handle those everyday transactions that individuals with sight take for granted. *ACB I*, 525 F.3d at 1259. Nevertheless, the same equitable power that permitted the district court to craft the 2008 injunction gave it considerable discretion in determining whether to modify it.

The district court did not exceed that discretion by denying the Council's Rule 60(b) motion.

For the foregoing reasons, the district court's judgment is affirmed.

*So ordered.*