# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued January 13, 2017            Decided March 3, 2017

No. 16-5203

GOVERNMENT OF THE PROVINCE OF MANITOBA AND STATE OF
MISSOURI, EX REL. CHRIS KOSTER, MISSOURI ATTORNEY
GENERAL'S OFFICE,
APPELLEES

v.

RYAN ZINKE, SECRETARY, U.S. DEPARTMENT OF THE
INTERIOR, ET AL.,
APPELLEES

STATE OF NORTH DAKOTA,
APPELLANT

————

Appeal from the United States District Court
for the District of Columbia
(No. 1:02-cv-02057)

————

*Nessa Horewitch Coppinger* argued the cause for appellant. With her on the briefs were *Fred R. Wagner* and *Jennifer L. Verleger*, Assistant Attorney General, Office of the Attorney General for the State of North Dakota.

*Scott M. DuBoff* argued the cause for appellees the Government of the Province of Manitoba and the State of

Missouri. With him on the brief were *Benjamin J. Lambiotte*, *Chris Koster*, Attorney General, Office of the Attorney General for the State of Missouri, *James R. Layton*, Solicitor General, and *Laura E. Elsbury*, Assistant Attorney General. *Eldon V. Greenberg* entered an appearance.

Before: BROWN and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by BROWN, *Circuit Judge*.

BROWN, *Circuit Judge*:   On March 1, 2016, North Dakota filed a motion to modify an injunction governing the Northwest Area Water Supply Project ("NAWS" or "the Project").  In a minute order, the district court stated North Dakota did not "present either changes in law or facts sufficient to warrant modifying the injunction" and summarily denied the motion "for the reasons argued by the [nonmovants]."  J.A. 45.  North Dakota appealed, and we remand with directions to grant the modification.  *See* 28 U.S.C. § 2106; *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 440 (1976).

I.

A.

For at least twenty years, North Dakota and the Bureau of Reclamation ("the Bureau")—a unit within the Department of the Interior—have attempted to design and construct NAWS, a project designed to ameliorate North Dakota's longstanding difficulties in obtaining sufficient quantities of high-quality drinking water.[1]   *See Gov't of Manitoba v.*

---

[1] The Project will cost approximately $145 million to construct. North Dakota will provide thirty-five percent of the funding, and

*Norton*, 398 F. Supp. 2d 41, 48 (D.D.C. 2005) (stating development of the first Environmental Assessment began in June 1997). If approved, the Project would withdraw water from the Missouri River Basin and transport it via a 45-mile-long pipeline to the Hudson Bay Basin located in Northwest North Dakota. *Id.* at 44. Thus, it would provide a new water source to approximately 81,000 citizens of North Dakota living within the Project communities. *Gov't of Manitoba v. Salazar*, 691 F. Supp. 2d 37, 43 (D.D.C. 2010).

The Project falls under the auspices of the National Environmental Policy Act ("NEPA"). 42 U.S.C. § 4321, *et seq*. NEPA imposes "a set of action-forcing procedures" requiring federal agencies to take a "hard look" at any potential environmental consequences associated with their "proposals and actions" and to broadly disseminate relevant environmental information. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Unfortunately for those living within the Project communities, the Bureau's repeated failures to comply with NEPA's requirements have left the Project mired in legal challenges for fourteen years (and counting).

One of NEPA's "action-forcing" procedures directs agencies to prepare an environmental impact statement ("EIS") for "major [f]ederal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). To determine whether a project constitutes a "major federal action," agencies begin by preparing an environmental assessment ("EA"). *See* 40 C.F.R. § 1508.9; *see also Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 12 (2d Cir. 1997). If the proposed action is not a "major federal action," the agency

the federal government will provide sixty-five percent. *Gov't of Manitoba v. Norton*, 398 F. Supp. 2d 41, 54 (D.D.C. 2005).

issues a finding of no significant impact ("FONSI"), which "briefly present[s] the reasons why an action . . . will not have a significant effect on the human environment." 40 C.F.R. § 1508.13. If it is a major federal action, the agency prepares the EIS, which must discuss the action's general impact, its unavoidable adverse impacts, its alternatives, the relationship between short-term environmental use and the "maintenance and enhancement of long-term productivity," and "any irreversible or irretrievable commitments of resources" should the proposal be implemented. 42 U.S.C. § 4332(C); *see also id.* § 4332(E) ("[A]ll agencies of the Federal Government shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.").

After issuing an EIS, the agency must also issue a record of decision ("ROD"), which is a "concise public record" that describes the agency's decision, "[i]dentif[ies] all alternatives considered by the agency," and states "whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted." 40 C.F.R. § 1505.2. An agency must publish notice in the Federal Register that it has filed a final EIS ("FEIS") with the Environmental Protection Agency, and it cannot approve the ROD until thirty days have passed from the date of that notice. 40 C.F.R. § 1506.10(b)(2); 23 C.F.R. § 771.127(a). The issuance of a ROD constitutes final agency action.

B.

In 2001, the Bureau issued an EA and FONSI for NAWS. Construction began in 2002, but, six months later, the Province of Manitoba challenged the sufficiency of the EA and FONSI on the grounds that they did not adequately

grapple with potential ecological problems caused by transferring treatment-resistant biota into the Hudson Bay Basin. *Gov't of Manitoba v. Norton*, 398 F. Supp. 2d 41, 44–45, 49 (D.D.C. 2005). According to the 2001 EA, water would be withdrawn from the Missouri River, "partially disinfected and pre-treated," travel via buried pipeline across the continental divide into the Hudson Bay Basin, and then receive final treatment. *Id.* at 46. Project water "would drain into the Souris River, which flows into Manitoba." *Id.* at 47–48. Manitoba claimed the Project would not adequately treat the water, resulting in the transfer of non-native biota into the Hudson Bay Basin. This could "eliminate indigenous species, cause reduced growth and survival rates in indigenous species, and change the trophic structure of fish communities." *Id.* at 45. North Dakota intervened as a Defendant. In February 2005, on cross-motions for summary judgment, the district court agreed with Manitoba, remanding the case to the Bureau for further NEPA work on this point. *Id.* at 66.

After the remand, Manitoba asked the district court to grant a permanent injunction governing all NAWS-related activities. Otherwise, it argued North Dakota would "plunge ahead" with construction so as to "create a *fait accompli*, limit the 'freedom of choice' essential to sound decision-making under NEPA[,] and risk irreversible environmental consequences." J.A. 53. Though the court noted the importance of "preserv[ing] for the agency the widest freedom of choice when it reconsiders its action after coming into compliance with NEPA," J.A. 53, it weighed that interest against "the avoidance of unnecessary delay in the delivery of a reliable source of high quality water to approximately 81,000 people," J.A. 54. The court also noted "the public interest is best preserved by ensuring attention to environmentally sensitive decision-making through the least-

intrusive means necessary." J.A. 55. Thus, rather than granting a full injunction, it permitted North Dakota to move forward with construction that would not impact the "opportunity for sound decision-making under NEPA." J.A. 55. Additionally, "[b]efore any other NAWS *construction* may proceed, the government must return to the Court to demonstrate why the proposed *additional construction* would not influence or alter the agency's ability to choose between water treatment options." J.A. 55 (emphasis added).

The Bureau completed its next NEPA analysis in January 2009. This time, the Bureau prepared an EIS rather than a FONSI, but it still identified the Missouri River as the Project source. However, its second attempt fared no better when subjected to judicial review.

Manitoba claimed the EIS still did not adequately address the transfer of treatment-resistant bacteria. Missouri filed a separate challenge, alleging the EIS did not properly account for cumulative effects of water withdrawal from the Missouri River. *See* Complaint, *Missouri ex rel. Koster v. U.S. Dep't of Interior, Bureau of Reclamation*, No. 1:09-cv-00373 (D.D.C. Feb. 24, 2009), ECF No. 1. The cases were consolidated in 2009 and, together, Manitoba and Missouri moved for summary judgment. They argued the Bureau had not taken a hard look at (1) reasonable alternatives to the Project, (2) "the cumulative impacts of the Project on Missouri River water levels," and (3) the consequences of bacteria transfer. *Gov't of Manitoba v. Salazar*, 691 F. Supp. 2d 37, 45 (D.D.C. 2010). On March 5, 2010, the court again remanded to the Bureau for further consideration of the second and third issues. *Id.* at 51. The court chastised the Bureau for "wast[ing] years by cutting corners and looking for short cuts," *id.*, as well as its "breathtaking" misreading of the court's 2005 opinion, *id.* at 50.

After the second remand, the Bureau engaged in a third, full-blown NEPA analysis that not only considered the two remanded issues, but also "reexamin[ed] and updat[ed] all prior NEPA analyses" associated with the Project. J.A. 719. The Bureau issued the final supplemental EIS ("FSEIS") in April 2015, and the ROD followed in August. The documents again identified the Missouri River as the selected Project alternative, with supplemental water taken from the Minot and Sundre aquifers, both of which are located in North Dakota. The FSEIS also included provisions for a water-treatment plant in North Dakota that, among other things, would inactivate treatment-resistant bacteria before the water transferred to the Hudson Bay Basin.

In January 2016, Missouri and Manitoba challenged the FSEIS once again. Summary judgment motions are currently pending before the district court.

## C.

On March 1, 2016, North Dakota filed a motion to modify the 2005 injunction, seeking permission to begin "paper design" of the proposed water-treatment plant. On June 14, 2016, the district court issued the following minute order ("Order") denying North Dakota's request:

> North Dakota asks this Court to further modify an injunction first issued in 2005 "to permit it only to undertake design work for the biota water treatment plant ('Biota WTP') to be located in Max, North Dakota," once a federal [FEIS] has been reviewed and approved. North Dakota assumes its own victory defending the FEIS. Since that briefing has just begun, the Court intimates no view on the matter but sees nothing in the Motion to

> present either changes in law or facts sufficient to warrant modifying the injunction again now. This motion is denied for the reasons argued by the Province of Manitoba and the State of Missouri.

J.A. 45.

On appeal,[2] North Dakota now asks for a remand with instructions to grant its requested modification. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

## II.

### A.

Under Federal Rule of Civil Procedure 60(b)(5), courts may afford relief from an injunction, including modification, where prospective application of the order is "no longer equitable." The party seeking modification "bears the burden of establishing that a significant change in circumstances warrants [its] revision." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992); *Horne v. Flores*, 557 U.S. 433, 447 (2009). "A party . . . may meet [this] initial burden by showing . . . a significant change either in factual conditions or in law." *Rufo*, 502 U.S. at 384. In particular, modification is appropriate "when enforcement . . . without modification would be detrimental to the public interest." *Id.*; *Horne*, 557 U.S. at 453 (noting the Rule 60(b)(5) inquiry "asks only whether a significant change either in factual conditions or in law renders continued enforcement of the judgment detrimental to the public interest"). If a movant meets this burden, the Court has even opined "a court abuses its discretion when it refuses to modify an injunction . . . in light

---

[2] The federal defendants are not participating in this appeal.

of such changes." *Horne*, 557 U.S. at 447; *Agostini v. Felton*, 521 U.S. 203, 215 (1997); *see also Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 122 (4th Cir. 2011) (noting modification "is *required* where there has been a significant change either in factual conditions or in law" (emphasis added)). At the very least, "the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383.

In the context of institutional reform litigation, where, as here, injunctions typically remain in place for many years, this Court and the Supreme Court have also recognized the need to employ a "flexible" approach to modification requests. *See id.* at 380 (noting that, "[b]ecause such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased"); *Horne*, 557 U.S. at 453 (same); *Petties ex rel. Martin v. District of Columbia*, 662 F.3d 564, 568–69 (D.C. Cir. 2011) (same).[3] "[T]he public interest is a

---

[3] The district court has followed this guidance, as it has revisited and considered modifications to the injunction on five previous occasions. Most recently, in 2013—i.e., after the 2010 remand and before the 2015 FSEIS—the court undertook a *sua sponte* review of the injunction. The parties had submitted a joint status report in October 2012, which had provided information about the Bureau's plans to engage in additional pipeline construction in 2013. The court held it would not permit Project work that could influence the Bureau's choices about how to address treatment-resistant bacteria, as well as the "fundamental question of the water source for NAWS." *Gov't of Manitoba v. Salazar*, 926 F. Supp. 2d 189, 192–93 (D.D.C. 2013) (noting that, because of the consolidation with Missouri's separate challenge, "the question of the source of the water is now part of the focus as well"). The court also stated its opinion reflected an "identical" purpose to its 2005 decision: "to fashion a more tailored remedy that permits the [P]roject to move

particularly significant reason for applying a flexible modification standard" where, as here, the injunction "reach[es] beyond the parties involved directly in the suit." *Rufo*, 502 U.S. at 381; *Petties*, 662 F.3d at 569. Finally, courts should keep in mind how long-term injunctions can impact a State's ability "to make basic decisions" for itself and its citizens. *See Horne*, 557 U.S. at 447 n.3 (describing this as one of the "features and risks" of long-term institutional reform litigation).

## B.

We review a district court's denial of a 60(b)(5) motion for abuse of discretion. *Pigford v. Johanns*, 416 F.3d 12, 20 (D.C. Cir. 2005). Mere brevity does not provide sufficient grounds to find an abuse of discretion has occurred. *See, e.g.*, *id.* at 18. Likewise, Federal Rule of Civil Procedure 52(a)(3)—which applies to rulings on Rule 60(b) motions— does not *require* written findings and conclusions. *See also* FED. R. CIV. P. 52(a) advisory committee's note to 1946 amendment (noting "the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts").

Even so, in this circumstance, we conclude the district court did abuse its discretion. Its Order denied North Dakota's motion for the "reasons argued" by the nonmovants. J.A. 45. This explanation can only be interpreted as a wholesale adoption of the nonmovants' arguments, which contain a number of dubious factual claims. For instance, Manitoba argued that, "[a]fter more than fifteen years[,] the Bureau has still not produced an environmental analysis that

---

forward . . . while preserving the opportunity for sound decision-making under NEPA." *Id.* at 192.

passes NEPA muster," J.A. 137, but this is the very question at issue in the summary judgment motions currently pending before the court. *See also* J.A. 142 n.10 (attacking the sufficiency of the FSEIS on the merits). Additionally, as will be discussed further below, the quantity of water within the Project community became a central issue in the modification request. But Manitoba sought to demonstrate water quantity had not diminished by presenting data from aquifers that North Dakota argued were not part of NAWS. *Compare* J.A. 145 (Manitoba's water-quantity data from the Little Muddy aquifer), *with* J.A. 1200–10 (list of Project aquifers from the FSEIS, which does not include Little Muddy), *and Gov't of Manitoba v. Norton*, No. 1:02-cv-02057 (Apr. 25, 2016), ECF No. 233-2 ¶ 3 (declaration of NAWS Project Manager stating "[t]he Little Muddy aquifer is not located in an area expected to be served by NAWS"); *compare* J.A. 146 (Manitoba's water-quantity data from New Rockford aquifer), *with Gov't of Manitoba*, No. 1:02-cv-0205, ECF No. 233-2 ¶ 3 (declaration of NAWS Project Manager stating "[t]he New Rockford aquifer is heavily appropriated and incapable of providing useful water supplies in the project area"). The Order does not explain why, despite this factual dispute, the court found Manitoba's presentation of data not only relevant, but also more persuasive.[4] Without a more nuanced and detailed explanation, the district court's acceptance of the nonmovants' arguments *in toto* constitutes an abuse of discretion. We therefore turn next to determining whether North Dakota met its burden under Rule 60(b)(5).

---

[4] The district court also does not explain why it believes paper design work constitutes "construction" under the terms of the original injunction. *See* J.A. 55.

12

III.

A.

At the outset, we note North Dakota significantly handicapped its own motion by erroneously asking the district court to apply the four factors set out in *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008),[5] as opposed to the standards under Rule 60(b)(5). This forced Manitoba and Missouri to respond not only by rebutting North Dakota's *Winter* arguments, but also by anticipating and defending against North Dakota's assertions as though they had been presented through the proper framework. The error also undisputedly impacted the district court's ability to evaluate the parties' competing claims. Analyzing North Dakota's request thus necessitates fleshing out its arguments in some detail.

Despite its legal error, North Dakota's opening and reply briefs before the district court identified three changed circumstances that the state claimed justified a modification. First, water quality and quantity concerns had become more acute and "continued to deteriorate." J.A. 86–87 (listing examples of deterioration). Second, the Bureau's completed FSEIS and ROD eliminated any concern that the modification

---

[5] These factors include (1) the likelihood of success on the merits; (2) whether plaintiffs are likely to suffer irreparable harm in the absence of injunctive relief; (3) whether the balance of the equities tips in the plaintiffs' favor; and (4) whether the injunction is in the public interest. 555 U.S. at 20.

would compromise the NEPA decisionmaking process.[6] Third, "[d]ue to the state's biennial budget cycle, if funding requests for this design work [were] not submitted by [Summer of 2016], funding may not become available until mid-2019."[7] J.A. 82; *see also* J.A. 165 (noting, in its reply brief to the district court, that "if the injunction is not modified before budget submissions in July, the available funds will likely remain unspent, leading to further budget reductions in 2017–19").

In support of its motion, North Dakota attached a declaration submitted by Timothy Freije—NAWS's Project Manager—stating the paper design work would take approximately twenty months to complete, and physical construction would require an additional two years. Thus, at a minimum, the plant would take four years to construct. Freije also stated the plant's paper design was the most time-consuming Project component. North Dakota also attached a copy of a Memorandum of Understanding ("the MOU") it had entered into with the Bureau, wherein North Dakota agreed to fund the paper design work at its own expense "until the NAWS injunction is lifted or the litigation is otherwise resolved." J.A. 106. It did not, however, attach any concrete data demonstrating decreased water quantity or quality.

---

[6] Though not presented as a stand-alone argument until its reply brief, North Dakota discussed the FSEIS and ROD sufficiently in its opening brief to avoid waiver. For instance, it argued "the requested design work cannot create an undue influence on [the Bureau's] NEPA review, which is complete." J.A. 93. Elsewhere, it noted "[t]his requested relief presents zero risk of environmental harm to any party and will in no way influence the [NEPA] process that was completed with [the Bureau's] issuance in 2015 of a [FSEIS] and ROD." J.A. 81.

[7] North Dakota abandoned this claim at argument. *See* Oral Arg. Recording 0:59–1:17; 1:17–1:35; 3:39–4:02.

To counter North Dakota's water *quantity* argument, Manitoba presented daily water level data from the years 2000 to 2016 for the Sundre, Little Muddy, and New Rockford aquifers. Each graph depicts significant variety in water levels, but all three show a general trend downward until about 2009, followed by a general upward trajectory that peaks between 2012 and 2014. *See* J.A. 144–46. Water levels in the Sundre and Little Muddy aquifers currently sit above where they rested in 2005.

North Dakota rebutted the relevance of this data by noting the Little Muddy aquifer lies outside the Project area. It also provided a second declaration from Freije, which stated the New Rockford aquifer "is already heavily appropriated . . . and is therefore incapable of serving as a useful municipal water supply." J.A. 163. Additionally, in its reply brief to the district court, North Dakota described the upward trend in water levels as temporary, noting the state experienced significant flooding during 2011. It presented hydrograph data demonstrating water levels had subsequently dropped and argued 2011's anomaly could not be used to predict water levels going forward.[8]

Regarding water *quality*, North Dakota referenced (without supporting data) increased levels of arsenic, total

---

[8] These hydrographs were for the Minot and Sundre aquifers. The Minot hydrograph indicates water levels rose in 2011 from approximately 1500 feet above NAVD88 to 1520 feet. By 2016, that level had dropped to 1507 feet. J.A. 173. At the Sundre aquifer, water levels rose in 2011 from approximately 1485 feet above NAVD88 to approximately 1510 feet. In 2016, that level hovered around 1508 feet. J.A. 174. At oral argument, counsel stated "two thirds" of the water gained through flooding had already been lost at the Minot aquifer. *See* Oral Arg. Recording 3:47–4:11.

dissolved solids ("TDS"), sodium, iron, and manganese in its opening brief to the district court. In response, Manitoba presented water-quality tables from Minot, one of the areas served by the Project, spanning the years 2011 to 2014. These tables reflect that sodium and TDS levels remained constant throughout this timeframe, and a 2002 Minot water-quality report attached to North Dakota's reply brief also recorded the same levels for these minerals. J.A. 134–35, 176.

However, comparing the 2002 and 2013 water-quality reports indicates arsenic levels have risen from 1.23 parts per billion in 2002 to 3.41 parts per billion in 2013.[9] Though still falling within the Safe Drinking Water Act's safe drinking water standards, *see* 42 U.S.C. § 300f, *et seq.*, the reports nevertheless demonstrate an almost threefold increase in arsenic during the course of the injunction's lifespan.

## B.

We conclude North Dakota presented two changed circumstances sufficient to justify granting its narrow modification.

First, issuance of the FSEIS and ROD constitutes a "significant change . . . in factual conditions" that "renders continued enforcement of the judgment detrimental to the public interest." *Horne*, 557 U.S. at 453. In its initial injunction decision, the court justified the tailored injunction by emphasizing the need to protect the integrity of the NEPA decisionmaking process. However, it did not consider this interest in isolation; instead, it weighed that interest against the need to "avoid[] . . . unnecessary delay in the delivery of a

---

[9] *Compare* J.A. 176, *with* J.A. 135 n.6, *available at* http://www.minotnd.org/documentcenter/view/420.

reliable source of high quality water to approximately 81,000 people." J.A. 54; *see also Gov't of Manitoba v. Salazar*, 926 F. Supp. 2d 189, 192 (D.D.C. 2013) (noting, in its 2013 injunction review, that its analysis reflected an "identical" purpose to its 2005 decision). The completion of the FSEIS and ROD marks the "consummation" of the Bureau's decisionmaking process regarding the Project's primary water source. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Appellees' legal challenge does nothing to undermine the finality of the decision; for the moment, at least, the Bureau has come to the end of the NEPA road.

Given this changed circumstance, we next ask whether North Dakota's requested modification was suitably tailored. The issuance of the FSEIS and ROD significantly eliminated—at least temporarily—the court's concerns about North Dakota's ability to exert influence over the Bureau's NEPA decisions.[10] This risk is further mitigated by North Dakota's agreement to incur all costs associated with the proposed paper design work until the injunction is lifted "or the litigation is otherwise resolved." J.A. 106. *See Petties*, 662 F.3d at 571 (noting the significant change in factual conditions inquiry should include whether the risks that led to injunctive relief have been "ameliorated, if not eliminated, as a result of changed circumstances"). On the other side of the scale, beneficiaries of NAWS necessarily face, at minimum, a four-year-long delay before North Dakota can finish

---

[10] In its sur-reply to the district court, Manitoba suggested that, "[i]f the Bureau's actions were a sufficient basis for modifying the Court's injunction, that would also have been true at various prior points in this litigation as well." J.A. 189. This is not entirely true. Only one of the five previous modifications occurred while a completed FEIS was in place. That request occurred in February 2010, and it was granted because it was unopposed. *See* Appellees Br. 8.

construction of the plant. With these two considerations in mind, we conclude North Dakota's requested modification poses no *current* harm to the NEPA process, but it will forward the goal of protecting the Project's population from unnecessary delay. *See Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 606 F.2d 1261, 1272–73 (D.C. Cir. 1979) (declining injunction over project construction despite NEPA violations after considering "the social and economic costs of delay" and "[t]he public interest to be served in the continued construction"); *Alaska v. Andrus*, 580 F.2d 465, 485 (D.C. Cir. 1978), *vacated in part on other grounds sub nom.*, *W. Oil & Gas Ass'n v. Alaska*, 439 U.S. 922. Since North Dakota will fund the design work, and because the design work does not even involve physical "construction"—the term used in the original injunction—we conclude the modification is "suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383.

In sum, the modification meets both the public interest and tailoring prongs of the Rule 60(b)(5) inquiry, and it therefore should be granted.[11]

Second, the increase in arsenic levels over the course of the injunction's lifespan also constitutes a significant changed circumstance warranting revision of the injunction. *Rufo*, 502 U.S. at 383. Exposure to arsenic in drinking water has been linked with cancer of the skin, liver, kidney, bladder, and

---

[11] Should the district court find for Manitoba and Missouri on summary judgment, it can ameliorate any concern that North Dakota's independent expenditures will influence the ongoing NEPA process by specifically ordering the Bureau to disregard those costs.

lung.[12]   Though Minot's water levels still fall within safe drinking water standards, this toxin has nearly tripled during the course of the injunction.  Further, the community must wait at least four years before any treatment plant can be built, during which time arsenic levels may continue to rise.  Given the narrow scope of North Dakota's proposed design work, we conclude the modification serves the public interest because it allows the State to attempt to reduce the duration of these exposure risks while causing no *current* harm to the NEPA process.  *See Rufo*, 502 U.S. at 381 (noting "the public interest is a particularly significant reason for applying a flexible modification standard" where the injunction "reach[es] beyond the parties involved directly in the suit"); *Petties*, 662 F.3d at 569; *see also Horne*, 557 U.S. at 447 n.3 (describing the potential for courts to "substantially restrict[] the ability of [a] State . . . to make basic decisions" as one of the "features and risks" of long-term injunctions).  Thus, here, too, the modification is suitably tailored to the changed circumstance, and the modification should be granted.

IV.

We conclude North Dakota met its burden of presenting two significant changed circumstances that warranted modifying the 2005 injunction.  It also requested a modification suitably tailored to those circumstances.  We therefore remand to the district court with instructions to grant the motion.

In so holding, we recognize our review has benefitted significantly from the rectification of North Dakota's legal error, as well as a more cogent presentation of its arguments.

---

[12] *See also* U.S. ENVTL. PROTECTION AGENCY OFFICE OF WATER, FACT SHEET, EPA DRINKING WATER STANDARD FOR ARSENIC 1 (2001).

We are also mindful that Rule 52(a) seeks "to lighten the burden on the trial court" by alleviating the need for lengthy written opinions and extensive factual findings in the majority of circumstances. *See* FED. R. CIV. P. 52 advisory committee's note to 1983 amendment. Nevertheless, the district court abused its discretion by summarily accepting the nonmovants' arguments. Furthermore, the relief North Dakota seeks is exceedingly narrow, and—at its own expense—it will use the modification to address an imminent public health crisis faced by its citizens. We find it appropriate under these circumstances to grant its request.

*So ordered.*