# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 19, 2017     Decided December 26, 2017

No. 17-5013

THE AMERICAN COUNCIL OF THE BLIND, ET AL.,
APPELLANTS

v.

STEVEN T. MNUCHIN, SECRETARY OF THE TREASURY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:02-cv-00864)

*Jeffrey A. Lovitky* argued the cause and filed briefs for the appellants.

*Megan Barbero*, Attorney, United States Department of Justice, argued the cause for the appellee. *Charles W. Scarborough*, Attorney, was with her on brief.

Before: HENDERSON and SRINIVASAN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In 2008, we held that visually impaired individuals lacked meaningful

access to United States paper currency in violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794. *Am. Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008) (remanding to district court). The district court subsequently issued an injunction ordering the Secretary of the United States Department of the Treasury (Secretary) to provide meaningful access by the next time the Treasury Department released redesigned banknotes. The Secretary approved a plan to do so that called for, in part, using raised tactile features on bills so that visually impaired individuals could differentiate banknote denominations by touch.

At the time, the district court and the parties expected—based on the timeframe of previous redesigns and the Secretary's representations—that the next round of redesigned currency would occur between 2013 and 2018. Now, however, the next redesigns will fall—if everything goes according to the Treasury Department's plan, which has not been the case so far—between 2026 and 2038. Understandably, plaintiffs American Council of the Blind and Patrick Sheehan asked the district court to modify the injunction to hold the Secretary to an earlier deadline for providing meaningful access to currency. The district court declined and this appeal followed. For the following reasons, we reverse and remand for the district court to better support its findings supporting its denial of modified injunctive relief.

## I. BACKGROUND

In 2002, the plaintiffs sued the Secretary, alleging that the design of United States paper currency violated section 504 of the Rehabilitation Act and seeking declaratory and injunctive relief. Section 504 of the Rehabilitation Act provides that no qualified individual with a disability "shall, solely by reason" of the disability, "be denied the benefits of" federal programs.

29 U.S.C. § 794(a). Under section 504, disabled individuals must have "meaningful access" to the benefit. *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

Depending on the source, an estimated 8 to 12 million Americans are visually impaired, including approximately 300,000 to 1.3 million who are blind. U.S. GOV'T ACCOUNTABILITY OFFICE, U.S. CURRENCY: READER PROGRAM SHOULD BE EVALUATED WHILE OTHER ACCESSIBILITY FEATURES FOR VISUALLY IMPAIRED PERSONS ARE DEVELOPED 3 (Sept. 2014) [hereinafter GAO U.S. CURRENCY REPORT] (collecting studies). The plaintiffs claimed visually impaired individuals lacked "meaningful access" to paper currency because denominations of our paper currency cannot be distinguished except by sight. Unlike the currency of many other countries, our paper currency does not come in different sizes or have different tactile characteristics that denote the currency's denomination.

The district court held that the Secretary had violated section 504 by "fail[ing] to design and issue paper currency that is readily distinguishable to blind and visually impaired individuals" and entered a declaratory judgment for the plaintiffs. *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51, 62 (D.D.C. 2006). We affirmed the declaratory judgment but remanded for the district court to "address the request for injunctive relief." *Am. Council of the Blind*, 525 F.3d at 1260. We did not prescribe how the Secretary must comply with section 504 but instead stated that the Secretary "has discretion to choose from a range of accommodations" to provide meaningful access to paper currency. *Id.* at 1271.

On remand, the district court held a hearing to determine the terms of the injunction. The district court, "detect[ing] . . . [t]he familiar slow moving hand of the government," Joint

Appendix (JA) 317, expressed concern about an "open-ended" timeline, JA 318. At the hearing, the Treasury Department counsel noted that the Secretary had an ongoing statutory mandate to protect against counterfeiting threats in any currency redesign[1] and said: "I think it's more than a goal, I think it is the standard that . . . every seven to 10 years [the Treasury] want[s] to come out with new designs." JA 325.

The district court apparently interpreted counsel to mean the Treasury Department "requires new currency" every seven to ten years. JA 328. There is no such statutory mandate, however; the seven-to-ten-year period is an internal government expectation. *See* JA 286 (Secretary's October 3, 2008 Status Report, describing timeline as "goal"). Against the backdrop of the seven-to-ten-year expectation, the district judge decided—and the parties agreed—that it would be "reasonable" to link the deadline for section 504 compliance to the next planned redesign. JA 328. At the time, the parties expected the next redesigns to fall between 2013 and 2018 if the seven-to-ten-year goal was adhered to as it had been since the 1990s.[2]

Accordingly, the district court issued an injunction on October 3, 2008, ordering the Secretary to "take such steps as

---

[1] The Secretary "shall" design currency "in the best manner to guard against counterfeits and fraudulent alterations." 12 U.S.C. § 418.

[2] The first modern round of redesigns to incorporate anti-counterfeiting features occurred between 1990 and 1993. After that, the $5 bill was redesigned in 2000 and 2008; the $10 bill was redesigned in 2000 and 2006; the $20 bill was redesigned in 1998 and 2003; and the $50 bill was redesigned in 1997 and 2004. *The History of American Currency*, U.S. CURRENCY EDUCATION PROGRAM, https://www.uscurrency.gov/content/history-american-currency (last visited Nov. 21, 2017).

may be required to provide meaningful access to [each denomination of] United States currency for blind and other visually impaired persons . . . not later than the date when a redesign of that denomination is next approved" by the Secretary.[3] JA 265. Thus, the district court coupled the Secretary's duty to provide meaningful access to currency to the timeline for the next currency redesign rather than setting a separate, firm deadline. Under the injunction, the Secretary also had to file status reports every six months.

In 2011, the Secretary approved the Treasury Department's Bureau of Engraving and Printing's (Bureau) recommended three-pronged approach to providing meaningful access to currency: (1) add a raised tactile feature to bills; (2) continue adding large, high-contrast numerals to bills; and (3) implement a supplemental currency-reader distribution program. At the time, the Secretary had not "established a timetable for the next currency redesign" although he restated the Bureau's "goal" to do so every seven to ten years. JA 286.

Since 2011, the Bureau has produced tangible results under the second prong; all denominations include large numerals and some denominations—the $5, the $50 and the $100—include high-contrast numerals. The Bureau has also achieved limited results under the third prong. It created and produced free currency readers (the iBill Talking Banknote Identifier, an electronic key-fob-style device that reads inserted

---

[3] The injunction did not include the $1 bill because the Congress prohibited the Secretary from redesigning the $1 bill. *See* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, sec. 6, div. D, tit. I, § 113. The prohibition is still in effect under current law. *See* Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, sec. 8, div. E, tit. I, § 117. The injunction also did not include the $100 bill because it was in the latter stage of a redesign at the time.

banknotes and announces the denomination by voice, tone or vibration) that, as of September 2017, it has distributed 55,216 times. It also developed free currency-reading applications for mobile phones (the EyeNote for Apple devices and the IDEAL Currency Identifier for Android devices), which have been downloaded a combined 47,868 times as of September 2017.[4] But the external currency readers help approximately 100,000 individuals—between 1.2 per cent and 4 per cent of all Americans who are visually impaired, depending on the source. Meeting the first prong has been a work in progress. Developing a raised tactile feature for paper currency that is durable and functional has proven to be difficult[5] and the Treasury Department has fallen "behind its internal schedule" to provide a raised tactile feature.[6] JA 415.

---

[4] The statistics on the number of downloads come from the Secretary's Eighteenth Status Report, which was filed in district court after briefing on appeal was complete. *Am. Council of the Blind v. Mnuchin*, No. 1:02-cv-00864, ECF 156 (Sept. 18, 2017). We take judicial notice of it. *See Veg-Mix, Inc. v. Dep't of Agric.*, 832 F.2d 601, 607 (D.C. Cir. 1987) ("Courts may take judicial notice of official court records . . . .").

[5] In Canada, for example, embossed features on currency often wear down after a few years in circulation. In Bureau focus-group testing of different styles and patterns of tactile features, folds and creases in bills sometimes confused participants in the study and caused misidentification of denominations. *Am. Council of the Blind v. Mnuchin*, No. 1:02-cv-00864, ECF 156, at 2. (Sept. 18, 2017).

[6] In July 2013, for example, the Bureau anticipated it would select the application method—that is, the manufacturing process by which the raised tactile feature is added to banknotes—by December 2013. JA 388. In the Secretary's most recent district court filing, the Bureau is still conducting testing to determine which of two potential application methods it will use. *Am. Council of the Blind v. Mnuchin*, No. 1:02-cv-00864, ECF 156, at 2. (Sept. 18, 2017).

In 2013, the Bureau established a 2020 target date to release a new $10 bill design but provided no specific target dates for the redesign of other bills. In 2016, the Bureau pushed the $10 bill target date to 2026, JA 467, because it "recently learned of significant developments in counterfeiting technology" that would require creating and implementing new security features for the next redesign, JA 460. The timeline for other bills remained unspecified.

In 2016, the plaintiffs moved to modify the district court's injunction pursuant to Federal Rule of Civil Procedure 60(b)(5).[7] Given the Treasury Department's delays in rolling out new versions of currency—the scheduled release of the $10 bill was then eight years behind what the parties contemplated at the time the district court issued the injunction, with the other denominations set to be released at an even later, unspecified date—the plaintiffs were no longer amenable to pairing meaningful access to currency with the timeline for the next anti-counterfeiting redesign. They asked the district court to set a deadline of December 31, 2020 for providing meaningful access to the $10 bill and a deadline of December 31, 2026 for providing meaningful access to the other denominations. The plaintiffs argued the delay in redesigning the currency against the backdrop of the initial seven-to-ten-year goal was a changed circumstance warranting modification of the injunction. *See Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992).

The district court denied the plaintiffs' motion. Under its Rule 60(b)(5) analysis, the district court held that the delay in releasing redesigned currency was not "so 'significant'" that

---

[7] Federal Rule of Civil Procedure 60(b)(5) provides in relevant part: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding [if] . . . applying [the judgment] prospectively is no longer equitable."

the injunction was "detrimental to the public interest." JA 840. The district court reasoned that the "balance struck by" the injunction—tying the provision of meaningful access to the next planned anti-counterfeiting redesign—would be "upset" by requiring the Treasury Department to produce two redesigns—one to provide meaningful access to visually impaired individuals and one to combat counterfeiting—released at different times. JA 840. The district court noted the "substantial" progress made by (1) creating a currency reader program and continuing to add large, high-contrast numerals to bills and (2) continuing to work toward including a raised tactile feature on bills. JA 840. Although declaring the progress "is not as significant as a released redesigned note," the district court concluded that forcing the Treasury Department to comply with a separate deadline might be "*more* detrimental to the public interest" than leaving the injunction unmodified. JA 840–41. Because the Treasury Department has an ongoing duty to produce currency that combats counterfeiting, the district court held, decoupling the timelines "could create unnecessarily duplicative work and potentially increase costs for both the government and the private sector." JA 841.

After the district court's ruling but before oral argument in our Court, the Treasury Department responded to a United States Senator's inquiry "about the incorporation of tactile features into the redesign of currency" and provided its "working timeline" for denominations other than the $10 bill, which timeline the Treasury Department had previously left unspecified: 2028 for the $5 note; 2030 for the $20 note; 2032–2035 for the $50 note; and 2034–2038 for the $100 note. Letter from Leonard Olijar, Dir. of Bureau of Engraving and Printing, to Sen. Ron Wyden (Aug. 1, 2017).[8]

---

[8] Like the download statistics, *supra* n.6, Director Olijar's letter was filed in district court after briefing on appeal was complete,

## II. ANALYSIS

Federal Rule of Civil Procedure 60(b)(5) provides that a court "may relieve a party" from an injunction if "applying [the injunction] prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Under the Rule, "a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo*, 502 U.S. at 384). The "party seeking relief bears the burden of establishing that changed circumstances warrant relief." *Id.* In institutional reform litigation, where, as here, an injunction typically remains in place for many years, the court "must take a 'flexible approach' to Rule 60(b)(5) motions." *Id.* (quoting *Rufo*, 502 U.S. at 381). We review a district court's denial of a 60(b)(5) motion for abuse of discretion. *Pigford v. Johanns*, 416 F.3d 12, 16 (D.C. Cir. 2005).

With the newest timeline, the Secretary will be in violation of federal law for eight to twenty more years than it would have been had it met its expected timeline for currency redesigns when the injunction issued. Its much greater than planned delay in providing meaningful access to visually impaired individuals is unquestionably a change in factual conditions. *See Evans v. Williams*, 206 F.3d 1292, 1298 (D.C. Cir. 2000) ("It is enough that the parties did not actually contemplate the changed circumstances" when the injunction issued). The Secretary acknowledges the change. *See* Appellee's Br. at 23 n.9 (noting the timeline "changed in light of unanticipated developments in counterfeiting technology"). He instead argues that the plaintiffs should live with their "strategic

---

*Am. Council of the Blind v. Mnuchin*, No. 1:02-cv-00864, ECF 156-1 (Sept. 18, 2017), and we likewise take judicial notice of it, *see Veg-Mix, Inc.*, 832 F.2d at 607.

choice[]" not to ask for a hard deadline when the injunction issued. Appellee's Br. at 23 n.9. But this argument misses the point of Rule 60(b)(5): it permits a court to alter an injunction to respond to unanticipated factual changes. *See United States v. W. Elec. Co., Inc.*, 46 F.3d 1198, 1205 (D.C. Cir. 1995) ("Rule 60(b)(5) does not foreclose modifications based on developments that, in hindsight, were things that 'could' happen. . . . The focus of Rule 60(b)(5) is not on what was possible, but on what the parties and the court reasonably anticipated.").

The question, then, becomes whether the changes are "significant" such that they "warrant relief." *Horne*, 557 U.S. at 447. Under the injunction's current terms, millions of visually impaired Americans who could have expected meaningful access to currency by 2018 must now wait until 2026 and beyond. In the meantime, only a fraction of them are helped by the other measures put in place by the Secretary. Balanced against the delay is the potential cost to the Treasury Department and the private sector of granting the plaintiffs' modification and forcing an earlier redesign of currency separate from the planned anti-counterfeiting redesign. The district court reasoned that granting the plaintiffs' motion may be "*more* detrimental" than leaving the injunction untouched because of the "potential increased costs" for both the government and the private sector. JA 840–41.

The plaintiffs argue the district court abused its discretion because (1) it improperly considered the costs to the government and the private sector and (2) even if such costs were permissibly considered, the district court lacked sufficient relevant evidence about the costs of decoupling the currency redesign timelines to make a reasoned decision that maintaining the injunction prospectively remains equitable.

We disagree with the plaintiffs' first argument. We agree with their second argument.

**A.**

The plaintiffs first argue that the district court improperly considered the cost to the Treasury Department of granting their proposed modification. According to the plaintiffs, the Treasury Department's cost cannot offset the public interest in requiring the Secretary to comply with the Rehabilitation Act. That argument is relevant to whether the Secretary is violating the Rehabilitation Act and is an issue we have already decided. *See Am. Council of the Blind*, 525 F.3d at 1271–74 (holding the Treasury Department's potential methods of compliance were not so expensive as to constitute undue burden, an affirmative defense to alleged Rehabilitation Act violation, *see Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993)). For the issue before the district court and now before us—the *timing* of compliance—the Treasury Department's financial burden is a relevant factor. *See Rufo*, 502 U.S. at 392–93 ("Financial constraints may not be used to justify . . . constitutional violations" but they "are a legitimate concern of government defendants in institutional reform litigation and therefore are appropriately considered in tailoring a[n injunction] modification"). The district court did not abuse its discretion by considering the costs to the government.

We reach the same conclusion regarding private sector costs. The plaintiffs argue such costs cannot be considered because no third parties intervened and because the Secretary lacks standing to assert their interests. But institutional reform cases such as this one "reach beyond the parties involved directly in the suit." *Rufo*, 502 U.S. at 301 (internal quotation omitted). The "public interest" is a "significant reason" undergirding Rule 60(b)(5)'s "flexible" modification standard.

*Id.* Here, private third parties will unquestionably be affected by the currency redesign: for example, approximately 400,000 ATMs will likely need to be modified to handle dispensing and authenticating bills with raised tactile features. *See* JA 759, 615. Therefore, the district court permissibly considered third-party costs as part of the overall "public interest." *See Twelve John Does v. District of Columbia*, 861 F.2d 295, 298 (D.C. Cir. 1988) ("[C]ourts sitting in equity are obliged to consider the interests of *all* those affected by a decree" in considering a 60(b)(5) modification request (emphasis added)).

**B.**

Although we do not believe the district court abused its discretion in considering the costs of granting modification, we conclude that it did abuse its discretion in denying the modification without adequate evidentiary support for the cited costs to the Treasury Department and the private sector. *See Kickapoo Tribe of Indians of Kickapoo Reservation in Kan. v. Babbitt*, 43 F.3d 1491, 1497 (D.C. Cir. 1995) ("The exercise of discretion contemplates reasoned decision making on the basis of relevant and appropriate considerations to the task at hand."). The district court based its decision at least in part on its conclusion that decoupling the timelines may significantly increase costs. The added financial burden of decoupling the timelines may very well render the Secretary's ongoing violation of the Rehabilitation Act—which the parties reasonably expected to be cured in one decade but under the Secretary's current timeline will stretch into a second decade, and most likely a third—equitable. But we find the record evidence insufficient to support such a conclusion.

Regarding the Treasury Department's costs, the district court relied solely on the declaration of Michael Wash, the Bureau's Associate Director and Chief Technology Officer.

Wash stated that the "investment required to prepare" the Bureau to produce banknotes with a raised tactile feature will be "less than" $5 million or "up to" $66 million, with annual maintenance costs of $12 million or less, depending on whether "existing manufacturing equipment can be used." JA 759. The declaration is inadequate to fully and independently serve as the basis for the district court's decision.

As an initial matter, the cost estimates are hardly precise. The district court was required to make a reasoned decision about whether the equities favor imposing an earlier timeline to provide meaningful access to the millions of visually impaired individuals who will be waiting a decade or longer than expected. A range of $5 to $66 million for investment costs and $12 million to an unknown lower sum for maintenance costs does not provide solid ground on which the district court could do so. Nor did the district court explain whether or how it took into account the enormous variance in potential costs.

But the variance matters: the equities tilt more in the plaintiffs' favor if the Treasury Department has to spend only an additional $5 million to provide meaningful access to currency in 2020 and 2026, rather than 2026 through 2038. A more concrete estimate of the financial burden of incorporating a raised tactile feature is necessary. The district court—and this Court—lacked it. As the Secretary's counsel acknowledged at oral argument, "we don't know exactly what the costs are." Oral Argument at 20:55–21:05.

Moreover, the "investment" costs—that is, purchasing or modifying printing equipment that can produce banknotes with a raised tactile feature—are upfront, nonrecurring costs. The Secretary's counsel argued that "the costs are going to increase significantly if we have two separate redesigns." Oral

Argument at 21:05–21:20. Granted, separating the redesigns may well be more inefficient. For example, the Treasury Department may have to change printing plates twice rather than once if a raised tactile feature is introduced before the next planned currency redesign. The costs of two redesigns will presumably then be higher than the cost of one redesign. But we do not know by how much. The investment costs cited by Wash are specific to producing a raised tactile feature and will be incurred whenever it is put to use without regard to coupling/decoupling. They tell us nothing about the difference in costs between the two timelines. And that financial difference is crucial to weighing the equities of the plaintiffs' requested modification.

Although decoupling the timelines and producing banknotes with a raised tactile feature sooner than 2026 (at the earliest) may lead to more annual maintenance costs and therefore more total costs, the district court gave no indication that it based its decision on that particular evidence. Instead, it appeared to accept the Secretary's arguments and the Wash declaration in their entirety, even though most of the projections did not speak to whether continuing to enforce the injunction—with the timelines coupled rather than decoupled—is "no longer equitable" under Rule 60(b)(5). "Without a more nuanced and detailed explanation, the district court's acceptance of the nonmovants' arguments *in toto* constitutes an abuse of discretion." *Gov't of Province of Manitoba v. Zinke*, 849 F.3d 1111, 1119 (D.C. Cir. 2017) (reversing denial of 60(b)(5) motion).

The district court order suffers a similar flaw regarding private sector costs. It cursorily stated that decoupling the redesign timelines could "potentially increase costs . . . for the private sector" and, again, relied only on the Wash declaration. JA 841. Wash's declaration, without more, "estimated a cost

impact of $3–4 billion" to the private sector. JA 759.[9] The costs include "upgrade costs" and equipment changes that "may" be necessary to allow banknote machines, such as ATMs, to handle banknotes with raised tactile features. JA 759–80. Further, Wash declared that decoupling the timelines, as the plaintiffs seek, "would . . . substantially increase private sector costs." JA 762.

Again, the evidence is insufficient to support the district court's conclusion. The only quantified costs in Wash's estimate are for upgrading and changing banknote equipment. As an initial matter, the soundness of his $3–4 billion estimate is unclear: even banking industry representatives say that "the

---

[9] The relevant part of the Wash declaration provides:

> The impact to the private sector of adding [a raised tactile feature] to a U.S. banknote is being studied. A[ raised tactile feature] on a banknote may complicate existing note feeding mechanisms and the banknote authentication technologies used by these devices. We have estimated a cost impact of $3–4 billion to the [banknote equipment manufacturer] community given the changes that may be required to this equipment and the number of these devices located throughout the U.S. . . .
>
> . . .
> . . . Requiring the Secretary to redesign each denomination twice in the near future, as I understand the plaintiffs envision—once to incorporate a [raised tactile feature] and again to incorporate new visual designs and enhanced security features to continue to minimize counterfeiting—would . . . substantially increase private sector costs . . . .

JA 759–60, 762.

industry cannot make reasonable estimates until [the Bureau] announces the specific height and application method of the tactile feature," GAO U.S. CURRENCY REPORT 20, which the Bureau has yet to do.

Moreover, whether machines such as ATMs must be changed in a redesign separate from the anti-counterfeiting redesign or as part of the same redesign, the private sector will have to incur those costs. *See* Oral Argument at 28:10–28:30 (Secretary counsel acknowledging Wash's cost estimates "will occur whenever the [raised tactile feature] is incorporated"). The Secretary argues that incorporating a raised tactile feature will be "incredibly expensive" and therefore "we should do it in a way that . . . is efficient." Oral Argument at 28:30–28:50. Although the private sector costs of two changes may be higher than the costs of a single coupled change, we do not have any data on the difference. The plaintiffs made this point to the district court below, *see* JA 807–08, but the district court order accepted the Secretary's position without "explain[ing] why" it found the Secretary's "presentation of data" persuasive, *Gov't of Province of Manitoba*, 849 F.3d at 1119.

Wash did declare that separating the meaningful-access redesign from the anti-counterfeiting redesign "would . . . substantially increase" private sector costs. JA 762. But his declaration gave no indication how "substantial" the increase may be. The magnitude of the increase matters in determining whether continued enforcement of the injunction, instead of modifying the injunction, is "detrimental to the public interest." *Horne*, 557 U.S. at 447. The district court needed more than guesstimates to make a reasoned decision. *See Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995) (district court abuses its discretion if "the reasons given [do not] reasonably support the conclusion" (quoting *Kickapoo Tribe*, 43 F.3d at 1497)).

The Secretary argues that the plaintiffs "quibble with the evidence" presented, Appellee's Br. at 24,[10] and we acknowledge that the district court need not provide an "over-elaboration of detail or particularization of facts," Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment; *see also Gov't of Province of Manitoba*, 849 F.3d at 1118 ("Mere brevity does not provide sufficient grounds to find an abuse of discretion has occurred."). Plaintiffs' counsel acknowledged that decoupling the timelines may create inefficiencies—and attendant increased costs—in the Bureau's production process. *See* Oral Argument at 39:00–39:34 (stating, in response to Court's question that "intuitively" it seems "decoupling would increase" costs because redesigns "operate on economies of scope," that such proposition appears "unquestionably true" but "there's [no]thing in the record on that"). If the district court is to properly conclude that withholding meaningful access to paper currency from millions of visually impaired individuals for eight to twenty years longer than expected—with external currency readers helping only a small fraction while they wait—remains equitable because of the potential financial burden resulting from granting the plaintiffs'

---

[10] At oral argument, the Secretary's counsel also noted a 2009 study commissioned by the Bureau that studied multiple ways to comply with the injunction and provided corresponding cost estimates. *See* Oral Argument at 28:00–28:10; ARINC ENGINEERING SERVICES, LLC, FINAL REPORT: STUDY TO ADDRESS OPTIONS FOR ENABLING THE BLIND AND VISUALLY IMPAIRED COMMUNITY TO DENOMINATE U.S. CURRENCY (July 2009). But the district court did not cite the study. Nor did Wash's declaration rely on it. The district court is free to consider it on remand but we note the study's data may be stale, given the length of time that has elapsed, the fact that the study's estimates were made before the Secretary had finalized a plan to provide meaningful access to visually impaired individuals and the fact that the study's estimates vary from Wash's estimates.

modification, the district court needs more concrete estimates of the costs that matter.

We recognize that our "review for abuse of discretion does not permit us to substitute our judgment for that of the trial court." *United States v. Mathis-Gardner*, 783 F.3d 1286, 1288 (D.C. Cir. 2015) (internal quotation omitted); *see also Nat'l Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642 (1976) (court reviewing for abuse of discretion does not ask whether it "as an original matter" would have reached same conclusion). We are not doing so. The district court may well deny the plaintiffs' Rule 60(b)(5) motion on remand but it must do so with adequate evidentiary support and reasoning. By failing to do so, we conclude, the district court abused its discretion. Accordingly, the district court denial of the plaintiffs' Rule 60(b)(5) motion is reversed and the matter is remanded for further proceedings consistent with this opinion.

*So ordered.*